38 A.3d 711

Amanda E. HOLT, Elaine Tomlin, Louis Nudi, Diane Edbril, Dariel I. Jamieson, Lora Lavin, James Yoest, Jeffrey Meyer, Christopher H. Fromme, Timothy F. Burnett, Chris Hertzog, Glen Eckhart, and Mary Frances Ballard, Appellants

v.

## 2011 LEGISLATIVE REAPPORTIONMENT COMMISSION, Appellee.

Senator Jay Costa, Senator Lawrence M. Farnese, Jr., Senator Christine M. Tartaglione, Senator Shirley M. Kitchen, Senator Leanna M. Washington, Senator Michael J. Stack, Senator Vincent J. Hughes, Senator Anthony H. Williams, Senator Judith L. Schwank, Senator John T. Yudichak, Senator Daylin Leach, Senator Lisa M. Boscola, Senator Andrew E. Dinniman, Senator John P. Blake, Senator Richard A. Kasunic, Senator John N. Wozniak, Senator Jim Ferlo, Senator Wayne D. Fontana, Senator James R. Brewster, and Senator Timothy J. Solobay, Appellants

v.

2011 Legislative Reapportionment Commission, Appellee.

Mayor Carolyn Comitta, Council President Holly Brown, William J. Scott, Jr., Herbert A. Schwabe, II, Jane Heald Close, Floyd Robert Bielski, David Laleike, E. Brian Abbott, Nathaniel Smith, and W. Donald Braceland, Appellants

v.

2011 Legislative Reapportionment Commission, Appellee.

Mayor Leo Scoda and Council Person Jennifer Mayo, Appellants

v.

2011 Legislative Reapportionment Commission, Appellee.

Thomas Schiffer, Alison Bausman, Rachel J. Amdur, Joan Tarka, Lawrence W. Abel, Margaret G. Morscheck, Lawrence J. Chrzan, Julia Schultz and Shirley Resnick, Appellants

v.

2011 Legislative Reapportionment Commission, Appellee.

Sekela Coles, Cynthia Jackson and Lee Taliaferro, Appellants

v.

2011 Legislative Reapportionment Commission, Appellee.

Patty Kim, Appellant

v.

2011 Legislative Reapportionment Commission, Appellee.

Edward J. Bradley, Jr., Patrick McKenna, Jr., Dorothy Gallagher, Richard H. Lowe, and John F. "Jack" Byrne, Appellants

v.

2011 Legislative Reapportionment Commission, Appellee.

Dennis J. Baylor, Appellant

v.

2011 Legislative Reapportionment Commission, Appellee.

Andrew Dominick Alosi, Appellant

v.

2011 Legislative Reapportionment Commission, Appellee.

Carlos A. Zayas, Appellant

v.

2011 Legislative Reapportionment Commission, Appellee.

William C. Kortz, Michelle L. Vezzani, Michael E. Cherepko, Gregory Erosenko, Joyce Popovich, John Bevec, Lisa Bashioum, and Richard Christopher, Appellants

v.

2011 Legislative Reapportionment Commission, Appellee.

Supreme Court of Pennsylvania.

Decided Jan. 25, 2012.

Opinion Issued Feb. 3, 2012.

368

Shauna Christine Clemmer, for Bureau of Elections, Department of State.

Linda L. Kelly, Office of Attorney General, Pittsburgh, for Attorney General's Office.

Clifford B. Levine, Pittsburgh, for Costa et al.

David J. Montgomery, Montgomery Law Firm, LLC, for William C. Kortz, et al.

Samuel C. Stretton, Law Office of Samuel C. Stretton, West Chester, for Mayor Comitta, et al.

Samuel C. Stretton, Law Office of Samuel C. Stretton, West Chester, for Mayor Leo Scoda and Council Person Jennifer Mayo.

Eric Louis Ring, Bala Cynwyd, for Schiffer, et al.

Robert Walter Scott, Robert W. Scott, P.C., Philadelphia, for Sekela Coles, Cynthia Jackson and Lee Taliaferro.

Adam Craig Bonin, Kevin Michael Greenberg, Flaster/Greenberg, P.C., Philadelphia, for Patty Kim.

Michael Churchill, Public Interest Law Center of Philadelphia (The), Virginia A. Gibson, David Newmann, Hogan & Hartson, L.L.P., Philadelphia, for Holt, et al.

James Manly Parks, Duane Morris, L.L.P., for Edward Bradley, Jr., Patrick McKenna, Jr., Dorothy Gallagher, Richard Lowe, John Byrne.

Dennis J. Baylor, pro se.

Andrew Dominick Alosi, pro se.

Carlos A. Zayas, pro se.

The Honorable Joseph A. Del Sole, Stephen John Del Sole, Del Sole Cavanaugh Stroyd, L.L.C., Pittsburgh, Charles E. O'Connor Jr., Philadelphia, William Shaw Stickman IV, Del Sole Cavanaugh Stroyd, L.L.C., Pittsburgh, James Richard Thornburg, for 2011 Legislative Reapportionment Commission.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## *ORDER*

PER CURIAM.

**AND NOW,** this 25th day of January, 2012, upon consideration of the petitions for review and briefs in these legislative

redistricting appeals, and after entertaining oral argument on January 23, 2012, this Court finds that the final 2011 Legislative Reapportionment Plan is contrary to law. PA. CONST. art. II, § 17(d).[1] Accordingly, the final 2011 Legislative Reapportionment Plan is **REMANDED** to the 2011 Legislative Reapportionment Commission with a directive to reapportion the Commonwealth in a manner consistent with this Court's Opinion, which will follow. *Id.*

The 2001 Legislative Reapportionment Plan, which this Court previously ordered to "be used in all forthcoming elections to the General Assembly until the next constitutionally mandated reapportionment shall be approved," *Albert v. 2001 Legislative Reapportionment Commission,* 567 Pa. 670, 790 A.2d 989, 991 (2002) (quoting *per curiam* order), shall remain in effect until a revised final 2011 Legislative Reapportionment Plan having the force of law is approved. PA. CONST. art. II, § 17(e).

All 2012 election dates shall remain the same, with the exception of the primary election calendar, which is adjusted as follows:

| | |
|---|---|
| Thursday, January 26 | First day to circulate nomination petitions |
| Thursday, February 16 | Last day to file nomination petitions |
| Thursday, February 23 | Last day to file objections to set aside nomination petitions |
| Monday, February 27 | Last day that court may fix for hearings on objections to nomination petitions |
| Friday, March 2 | Last day for court to finally determine objections to nomination petitions |
| Friday, March 2 | Last day for withdrawal by candidates who filed nomination petitions |

Any signatures on nomination petitions dated January 24 or January 25, 2012, shall be deemed valid as to timeliness,

---

1. For administrative purposes only, we have designated the appeal in *Holt v. 2011 Legislative Reapportionment Commission,* 7 MM 2012 / J–7–2012, as the lead case.

subject, however, to any other statutory challenge.

Jurisdiction is retained.

Justice SAYLOR files a dissenting statement, in which Justice EAKIN and Justice ORIE MELVIN join.

Justice SAYLOR, dissenting.

Based on the petitions, briefs, and argument, I am not persuaded that the 2011 Legislative Reapportionment Plan is contrary to law as reflected in the existing precedent. Although I am receptive to the concern that past decisions of the Court may suggest an unnecessarily stringent approach to equalization of population as between voting districts, I believe this could be addressed via prospective guidance from the Court.

Justice EAKIN and Justice ORIE MELVIN join this dissenting statement.

## *OPINION*

Chief Justice CASTILLE.

Legislative redistricting "involves the basic rights of the citizens of Pennsylvania in the election of their state lawmakers."[1] In twelve separate matters, Commonwealth citizens, acting singly or in groups, filed appeals from the Final Plan for legislative redistricting of the Commonwealth, which was devised by appellee, the 2011 Pennsylvania Legislative Reapportionment Commission (the "LRC"), in response to the U.S. decennial census. In an attempt to conduct meaningful appellate review with the prospect of minimal disruption of the 2012 primary election process, this Court ordered accelerated briefing and oral argument. Expedition was required, as in all redistricting appeals, in part due to the compressed time frame in which to accomplish the task before the next election—particularly in an election year involving a presidential primary. However, the Court was aware at the outset that its

1. *Butcher v. Bloom*, 415 Pa. 438, 203 A.2d 556, 559 (Pa.1964).

efforts at expedition were incapable of avoiding interference with the primary election season because, for reasons not addressed by the LRC, the LRC failed to adopt a Final Plan in a timeframe that offered the remote prospect of appellate review before the primary season began. The LRC's inexplicable delay ensured that primary candidates who relied upon the 2011 Final Plan did so at their peril. As we discuss in detail *infra*, the Pennsylvania Constitution makes clear that a reapportionment plan can never have force of law until all appeals are decided, and even then, only if all challenges are dismissed. *See* PA. CONST. art II, § 17(e).[2]

In any event, fourteen days after the appeals were filed, seven days after the matters were briefed, and two days after the appeals were argued, this Court issued its mandate in a *per curiam* order filed January 25, 2012. That order declared that the Final Plan was contrary to law under Article II, Section 17(d) of the Pennsylvania Constitution, and consistently with the directive in that constitutional provision, we remanded the matter to the LRC to reapportion the Commonwealth in a manner consistent with an Opinion to follow. This is that Opinion.

The substantive task of the LRC in decennial redistricting is governed by Article II, Section 16 of the Pennsylvania Constitution, which provides:

> The Commonwealth shall be divided into fifty senatorial and two hundred three representative districts, which shall be composed of compact and contiguous territory as nearly equal in population as practicable. Each senatorial district shall elect one Senator, and each representative district one Representative. Unless absolutely necessary no county, city, incorporated town, borough, township or ward shall be

2. Eminent counsel for the LRC acknowledged this fact at oral argument:

> CHIEF JUSTICE CASTILLE: Let me ask you this, what if we send the plan back? What happens?
> [LRC COUNSEL]: I guess the current seats are still in effect if the plan goes back. The Commission would have to do what the Court instructs us to do. It is uncharted territory, Chief Justice, I can tell you that.

Transcript of Oral Argument, 1/23/2012, at 165.

divided in forming either a senatorial or representative district.

PA. CONST. art. II, § 16. The Constitution also specifically provides that, once the LRC has adopted a Final Plan, "any aggrieved person" may appeal directly to this Court. PA. CONST. art. II, § 17(d). The Constitution further commands that, if that aggrieved citizen "establishes that the final plan is contrary to law," this Court "shall issue an order remanding the plan to the commission and directing the commission to reapportion the Commonwealth in a manner not inconsistent with such order." *Id.*

In our most recent redistricting opinion, *Albert v. 2001 Legislative Reapportionment Commission,* 567 Pa. 670, 790 A.2d 989, 991 (Pa.2002), we rejected a series of localized challenges to a final plan, which were based on lack of compactness, alleged unnecessary splits of particular political subdivisions, and other issues. Central to our decision in that case was our recognition that the challengers there had "focused primarily on the impact of the plan with respect to their particular political subdivision, rather than analyzing the plan as a whole, as is required under a proper constitutional analysis." *Id.* at 995. We repeated the admonition in our legal analysis, noting that "[t]he Commission persuasively argues that none of the appellants ha[s] met the heavy burden of establishing that the final plan, as a whole, is contrary to law." *Id.* at 998.[3]

As we develop more fully below, we find that the 2011 Final Plan is contrary to law because appellants—in particular, the appellants in *Holt v. 2011 Legislative Reapportionment Commission,* 7 MM 2012, and to a lesser extent, the appellants in *Costa v. 2011 Legislative Reapportionment Commission,* 1 WM 2012—have heeded the admonition in *Albert,* and they have demonstrated that the Final Plan, considered as a whole, contains numerous political subdivision splits that are not absolutely necessary, and the Plan thus violates the constitutional command to respect the integrity of political subdivi-

---

3. *Albert* and our other reapportionment decisions are addressed at length *infra.*

sions. Furthermore, in their challenge, the appellants have shown that the LRC could have easily achieved a substantially greater fidelity to all of the mandates in Article II, Section 16—compactness, contiguity, and integrity of political subdivisions—yet the LRC did not do so in the Final Plan.

Although we are satisfied that the appellants challenging the Final Plan as a whole have made their case under existing decisional law and constitutional imperative, our consideration of this appeal, and our review of prior law, has convinced us that, going forward—and the initial opportunity to go forward is upon this remand—a better and more accurate calibration of the interplay of mandatory constitutional requirements would provide salutary guidance in future redistricting efforts. *Accord* Order, 1/25/12 (*per curiam*) (Saylor, J., dissenting, joined by Eakin and Orie Melvin, JJ.).[4] Part VII of this Opinion provides that guidance.

The delay of the LRC in producing a Final Plan has created a situation where, notwithstanding the alacrity with which this Court has acted, this Court's discharge of its constitutional duty to review citizen appeals has resulted in disruption of the election primary season. But, in these circumstances, ones not of this Court's creation, the rights of the citizenry and fidelity to our constitutional duty made the disruption unavoidable.

## I. Background for the Adoption of the 2011 Final Plan

Every ten years, following the federal decennial census, our Constitution mandates reapportionment, or redistricting, of the Commonwealth. *See* PA. CONST. art. II, § 17(a).[5] The federal decennial census is conducted pursuant to Article I, Section 2 mandates of the U.S. Constitution to count every

---

4. Mr. Justice Savior's dissent states: "Based on the petitions, briefs, and argument, I am not persuaded that the 2011 Legislative Reapportionment Plan is contrary to law as reflected in the existing precedent. Although I am receptive to the concern that past decisions of the Court may suggest an unnecessarily stringent approach to equalization of population as between voting districts, I believe this could be addressed via prospective guidance from the Court."

5. Reapportionment is perhaps a less apt term for the task than redistricting, for although the occasion for the process is the change in

resident of the United States for the purpose of apportioning representatives to the U.S. Congress among the States. *See* U.S. CONST. art. I, § 2, cl. 3; amend. XIV, § 2; XVI. The Commonwealth uses U.S. Census data for the purpose of apportioning and demarcating Pennsylvania seats in the U.S. House of Representatives, the state House of Representatives, and the state Senate. The process of reapportioning the Pennsylvania General Assembly is specifically outlined in Article II, Section 17 of the Pennsylvania Constitution.

As required by Section 17, a reapportionment body was constituted in 2011, the year following the federal decennial census. *See* PA. CONST. art. II, § 17(a). That body, the LRC, consists of five members, four of whom are specifically identified by the Constitution based upon their partisan leadership roles in the General Assembly: for this reapportionment, the members are the Senate Majority Leader (Dominic Pileggi (R)), the Senate Minority Leader (Jay Costa (D)), the House Majority Leader (Mike Turzai (R)), and the House Minority Leader (Frank Dermody (D)). *See* PA. CONST. art. II, § 17(b). On February 18, 2011, the President *pro tempore* of the Pennsylvania Senate and the Speaker of the Pennsylvania House of Representatives certified these four automatic members to serve on the 2011 LRC. Section 17(b) provides that the four legislative members of the LRC shall select the fifth member, who will serve as chairman, within forty-five days of their certification. If the legislative leaders fail in this task, the Supreme Court is required to appoint the chairman within thirty days. On the forty-fifth day after their certification, on April 4, 2011, the legislative members announced their failure to agree on the chairman of the LRC, leaving the task of appointment to this Court. Fifteen days later, on April 19, 2011, this Court appointed as LRC chairman the Honorable Stephen J. McEwen, Jr., President Judge Emeritus of the Superior Court of Pennsylvania. The Court's prompt action afforded the LRC two additional weeks to perform its task.

population distribution revealed by the census, the process requires consideration of other factors in establishing new House and Senate districts. Although we use both terms, the Pennsylvania Constitution uses the term "reapportionment." *See* PA CONST. art. II, § 17.

The LRC appointed its technical staff and legal advisors at an administrative meeting in May 2011.

The U.S. Census Bureau had released 2010 census data to the Commonwealth on March 9, 2011. *See* Pennsylvania Legislative Redistricting website, http://www.redistricting. state.pa.us/index.cfm. This data was released well before the deadline provided by federal law. *See* 13 U.S.C. § 141 ("basic tabulations of population of each other State, shall, in any event, be completed, reported, and transmitted to each respective State within one year after the decennial census date," *i.e.*, April 1, 2011).

On August 17, 2011, after a lengthy delay, the LRC accepted the U.S. census data as presented by the Legislative Data Processing Center ("LDPC") and contractor Citygate GIS as "usable," and resolved that the availability of the data triggered the ninety-day period for filing a preliminary redistricting plan. *See* PA. CONST. art. II, § 17(c) ("No later than ninety days after either the commission has been duly certified or the population data for the Commonwealth as determined by the Federal decennial census are available, whichever is later in time, the commission shall file a preliminary reapportionment plan with such elections officer."). There is no explanation for the LDPC's delay in generating "usable" data, a circumstance we will address below.[6]

The LRC held public hearings in Allentown and Pittsburgh, on September 7 and 14, 2011, and announced a preliminary

---

6. In a document provided to the LRC entitled "Legal Issues Implicated by the 2011 Decennial Legislative Reapportionment of the Commonwealth of Pennsylvania—An Overview," LRC's counsel suggested that the data was available in usable form "only after the raw data with the breakdown by precinct and ward has been processed and edited by the LDPC [Legislative Data Processing Center] and the final form of data is delivered to the Commission." *See* Del Sole Cavanaugh Stroyd LLC Memorandum at 5, attached as Exhibit A to the Appendix to the Petition for Review filed by the *Costa* Appellants at 1 WM 2012.

For the proposition that the LRC did not have "usable" data until August 2011, despite the earlier availability of census data, the LRC relied on an account of the 1981 and 1991 Reapportionments authored by Dean Ken Gormley, who was the Executive Director of the 1991 Legislative Reapportionment Commission, and is at present the Dean of the Duquesne University School of Law.

redistricting plan on October 31, 2011, at a public administrative meeting in Harrisburg. The LRC approved the preliminary plan by a vote of 3 to 2, with the minority leaders in the House and Senate dissenting. On November 16, the LRC approved technical corrections to the preliminary plan for the House of Representatives. The LRC entertained citizens' comments and objections to the preliminary redistricting plan at public hearings in Harrisburg, on November 18 and 23, 2011, *see* PA. CONST. art. II, § 17(c), but made no further changes and offered no formal response to citizen concerns. On December 12, 2011, the LRC approved its Final Plan by a vote of 4 to 1, with Senate Minority Leader Jay Costa dissenting.

Absent appeals within the thirty day period afforded by the Constitution, the Final Plan would have had force of law. *See* PA. CONST. art. II, § 17(e). However, twelve separate appeals from the 2011 Final Plan were filed by citizens claiming to be aggrieved, as is their constitutional right. *See* PA. CONST. art. II, § 17(d) ("Any aggrieved person may file an appeal from the final plan directly to the Supreme Court within thirty days after the filing thereof."). In each appeal, the appellants filed petitions for review, against several of which the LRC filed

[T]he Commission asked whether data was deemed to b[e] "available" when it received the "raw" form from the federal government or when it was translated into a form that was actually usable. The Chief Justice issued an unpublished Order [on March 26, 1981], which stated that the census data became available "in usable form (breakdown of data by precinct and ward)." In 1991, some members of the Commission considered again seeking clarification on the definition of "usable." Ultimately, the Commission decided that it, not the Supreme Court, was the best judge of when the data provided to it was in a form that was sufficiently "usable" for its purposes. As such, the Commission sought no further clarification from the Court and deemed the data to be "usable" on June 27, 1991—when the data had been revised and delivered to the Commission from the Legislative Data Processing Center ("LDPC").

Del Sole Cavanaugh Stroyd LLC Memorandum at 4–5 (citations omitted); *see also* Ken Gormley, The Pennsylvania Legislative Reapportionment of 1991, at 22–24 (Commonwealth of Pennsylvania Bureau of Publications 1994).

No party to these appeals objects to the notion that the data must be in "usable" form before the LRC can formulate a preliminary plan.

preliminary objections.[7] The LRC also filed a prompt consolidated answer, responding to the first eleven petitions for review.[8] This Court then directed briefing on an accelerated schedule; all parties timely complied. The Court reserved a special session to hear oral argument on January 23, 2012, in Harrisburg, five days after briefing, and we heard argument in nine of the appeals that day. Many of the appeals raise overlapping claims, and indeed, in some instances, appellants ultimately relied upon the briefs of other aggrieved citizens.[9]

Two days later, on January 25, 2012, this Court issued a *per curiam* order, declaring that the Final Plan was contrary to law, and remanding to the LRC with a directive to reapportion the Commonwealth in a manner consistent with this Court's Opinion, which would follow. *See* Order, 1/25/12 (*per curiam*) (citing PA. CONST. art. II, § 17(d)). Our *per curiam* order also directed that the 2001 Legislative Reapportionment Plan, which this Court previously ordered to "be used in all forthcoming elections to the General Assembly until the next constitutionally mandated reapportionment shall be approved," would remain in effect until a revised final 2011 Legislative Reapportionment Plan having the force of law is approved. *See* Order, 1/25/12 (*per curiam*) (citing PA. CONST. art. II, § 17(e) and *Albert*, 790 A.2d at 991). That aspect of our mandate arose by operation of law; where a Final Plan is challenged on appeal, and this Court finds the plan contrary to law and remands, the proffered plan does not have force of law, and the prior plan obviously remains in effect.[10] Mr.

---

7. We address the propriety of preliminary objections in legislative redistricting appeals and the LRC's filings *infra*.

8. The twelfth petition, *Zayas v. 2011 Legislative Reapportionment Commission*, 17 MM 2012/J-31-2012, proceeded separately, due to an administrative delay in ascertaining the timeliness of the appeal. Briefing in that matter was completed after oral argument, and it was submitted on the briefs.

9. Three of the appeals were submitted for consideration on the briefs: *Zayas: Coles v. 2011 Legislative Reapportionment Commission*, 5 MM 2012/J-5-2012; and *Alosi v. 2011 Legislative Reapportionment Commission*, 10 MM 2012/J-10-2012.

10. Of course, the Court was cognizant that the LRC's timeline in adopting a Final Plan had ensured that the appeals would carry into the

Justice Saylor filed a dissenting statement, in which Mr. Justice Eakin and Madame Justice Orie Melvin joined.

## II. Preliminary Issues

### A. The LRC's Delay in Adopting a Final Plan

As we have noted, the Final Plan was adopted at such a late date as to ensure that, even with adoption of the most accelerated of processes, this Court would lack adequate time to consider the matter, with due reflection, and issue a mandate and reasoned decision before the primary election process was underway. The delay is unexplained; and it stands in stark contrast to the timing of the adoption of prior plans, plans that were no doubt created with less advanced computer technology. The Constitution provides that "[n]o later than ninety days after either the commission has been duly certified or the population data for the Commonwealth as determined by the Federal decennial census are available, whichever is later in time, the commission shall file a preliminary reapportionment plan...." PA. CONST. art. II, § 17(c). The year 2012 is a presidential election year, with the result that the Pennsylvania primary is held three weeks earlier than in

period when nomination petitions could begin to be circulated, and that any mandate other than outright denial or dismissal of the appeals could cause disruption of that process. Therefore, the *per curiam* order also was careful to adjust the primary election schedule and, consistently with the order we entered on February 14, 1992, the last time a presidential primary occurred in a reapportionment year, we directed that petition signatures collected before our mandate issued would be deemed valid as to timeliness. *See* Order, 1/25/12 (*per curiam* ). Our adjustment of the primary election calendar does not alter the discretion vested in the Commonwealth Court, which will be tasked in its original jurisdiction with hearing any objections to nominating petitions. The Election Code provides a very restrictive time schedule, specifically including a ten day cut-off for hearings and a fifteen day deadline for decisions. 25 P.S. § 2937. However, this Court recognized that appeals of this nature entail the "exercise of purely judicial functions." *In re Nomination Petition of Moore,* 447 Pa. 526, 291 A.2d 531, 534 (Pa.1972). Thus, as it respects the judicial function, the Election Code's deadlines are understood in this context as "directory," although the deadlines and requirements of the Code will remain mandatory as to petitioners. *See also Mellow v. Mitchell,* 530 Pa. 44, 607 A.2d 204, 224 (Pa.1992) (same); *In re Shapp,* 476 Pa. 480, 383 A.2d 201, 204 (Pa.1978) (same).

other years, and that all primary filing and litigation deadlines are advanced by three weeks as well.[11] Indeed, the first day to circulate nomination petitions for the primary was January 24, 2012. Despite this known fact, the LRC did not adopt its Final Plan until December 12, 2011, a mere forty-three days before that important date. Under the Pennsylvania Constitution, persons aggrieved by the Final Plan had thirty days to file an appeal to this Court, or until January 11, 2012, which is the very day the bulk of the twelve appeals were filed. PA. CONST. art. II, § 17(d). Even with accelerated briefing and argument, the appeals could not be decided with a reasoned opinion before January 24, 2012. And, obviously, the lateness of the adoption of the Final Plan virtually ensured that no remand could be accomplished without disrupting the primary process.

As noted above, the LRC states that the 2010 census data was not "available" before August 17, 2011, the date the LDPC provided it with the census data in "usable form," and that "this event triggered the 90–day time-period for formulating a preliminary reapportionment plan." LRC's Brief at 10: accord Costa Brief at 3. Notably, with far less sophisticated technology in 1991, and with two fewer rounds of redistricting experience, the LDPC was able to produce the census data in usable form by June 27th of that year—fifty-one days sooner. Gormley, Legislative Reapportionment, at 24.[12] This diligent

11. Section 603 of the Election Code provides, in relevant part:

**General Primary; Candidates to Be Nominated and Party Officers to Be Elected.** (a) There shall be a General primary preceding each general election which shall be held on the third Tuesday of May in all even-numbered years, except in the year of the nomination of a President of the United States, in which year the General primary shall be held on the fourth Tuesday of April. Candidates for all offices to be filled at the ensuing general election shall be nominated at the General primary. The vote for candidates for the office of President of the United States, as provided for by this act, shall be cast at the General primary.

25 P.S. § 2753(a).

12. Dean Gormley's account of the 1991 reapportionment describes at some length the diligent efforts of the LRC and the LDPC to ensure that the census data was in usable form as soon as possible. *See* Gormley, Legislative Reapportionment, at 22–24.

effort allowed the 1991 LRC greater time for commentary and adjustment, and permitted adoption of the 1991 Final Plan, which also affected a presidential primary election season, as early as November 15, 1991, twenty-seven days sooner than the 2011 Final Plan was filed. *See In re 1991 Pa. Legislative Reapportionment Comm'n,* 530 Pa. 335, 609 A.2d 132, 135 (Pa.1992) (*"In re 1991 Plan "*); *see also In re Reapportionment Plan,* 497 Pa. 525, 442 A.2d 661 (Pa.1981) (*"In re 1981 Plan "*) (LRC filed its 1981 Final Plan on October 13, 1981). Likewise, the 2001 LRC, which did not face the compression of a presidential primary season, produced its Final Plan on November 19, 2001, twenty-three days earlier than the Plan adopted by the 2011 LRC. *See Albert,* 790 A.2d at 992.

The LRC provides no further information about the LDPC's procedures, and what precisely the LDPC must do to the so-called "raw" census data in order to render it "usable" by the LRC for redistricting purposes. Given advances in computer technology since 1991, and the cumulative experience of those tasked with amassing and providing the data to the LRC, the delay here, in a presidential primary year, is as troubling as it is inexplicable. We remind the LRC that the Constitution specifically authorizes appeals from final plans, and the LRC this year, and whatever entity bears the burden in future years, should thus approach its bipartisan constitutional task with an eye toward affording sufficient time for meaningful appellate review, if appeals are filed.

## B. *The LRC's Preliminary Objections*

The LRC filed preliminary objections in most of these appeals, seeking outright dismissal for what it terms pleading defects. After the initial petitions for review were filed, but before briefing, the LRC filed preliminary objections in *Costa, Comitta, Scoda, Coles, Kim, Bradley,* and *Kortz,* asserting that those petitions should be dismissed for failure to include a verification. The LRC also filed preliminary objections in *Baylor* and *Alosi,* two of the *pro se* appeals, asserting that those appellants violated rules regarding the form of pleading. LRC's Preliminary Objections (citing Pa.R.A.P. 1513(c)). The

LRC did not file preliminary objections in either *Schiffer*, *Zayas*, or *Holt*, which this Court has designated as the lead appeal. The LRC argues that redistricting challenges arise in this Court's original jurisdiction and, therefore, as in all other original jurisdiction matters, all rules regarding pleading and verification apply here. LRC's Preliminary Objections (citing Pa.R.A.P. 1517 (Pennsylvania Rules of Civil Procedure apply to petitions for review filed in appellate court's original jurisdiction); Pa.R.A.P. 1513(e)(5) (petition for review filed in appellate court's original jurisdiction must be verified)).

The *Costa* appellants responded with a motion to strike the LRC's preliminary objections, arguing that redistricting appeals lie in this Court's appellate rather than original jurisdiction and that as such, no verification is required. *See Costa* Motion to Strike at 4 (citing Pa.R.A.P. 1513(d)). Appellants in *Coles*, *Kim*, and *Bradley* joined the *Costa* motion to strike. The appellant in *Baylor* sought to "cure" the alleged defects with additional filings.[13]

Our mandate having already issued, without dissent on the grounds specified in the preliminary objections, the preliminary objections obviously must fail.[14] Nonetheless, it is important to address the nature of these appeals, and the consequent propriety of preliminary objections, because of the supplementary layer of complexity and delay that would result from permitting preliminary objections in cases already subject to an accelerated appeals process.

13. Appellant Baylor sought to file an amended petition for review, with additional substantive material. Baylor also filed an application for post-submission communication, in which he claimed that the late filing of the LRC's preliminary objections foreclosed any opportunity to respond in a timely fashion. In response, the LRC challenged Baylor's request to amend as an improper attempt to add waived new claims to his petition for review. Given our disposition, *infra*, these ancillary petitions are denied.

14. Notably, at oral argument, the LRC did not press its preliminary objections, going instead to the merits of the appeals. In any event, the *Holt* appeal, upon which we primarily base our disposition, was not challenged by preliminary objections. Nevertheless, since these matters involve the preeminent right to the franchise and to selection of the representatives who give voice to the citizens' concerns, mere technicalities in pleadings shall not impede our deliberative process.

The question of whether preliminary objections to petitions for review are cognizable in redistricting appeals turns on whether these appeals are properly viewed as sounding in this Court's original or its appellate jurisdiction. Our Constitution describes the process to challenge the Final Plan: "[a]ny aggrieved person may file an **appeal** from the final plan directly to the Supreme Court. . . ." PA. CONST. art. II, § 17(d) (emphasis supplied); *accord* 42 Pa.C.S. § 725(1). In concert with that constitutional authority, our Rules expressly provide that, unless otherwise ordered, "appeals" under Article II, Section 17(d) shall proceed under Chapter 15 of the Rules of Appellate Procedure, which generally governs judicial review of governmental determinations, such as agency appeals to the Commonwealth Court. Pa.R.A.P. 3321; see Pa.R.A.P. 1501(a). Rule 1516(a) specifies that petitions for review in redistricting appeals proceed within this Court's appellate jurisdiction. *See* Pa.R.A.P. 1516(a). Additionally, as the *Costa* appellants note, this Court has generally utilized terminology applicable to appeals in reviewing reapportionment challenges. *See Costa* Motion to Strike at 3 (citing, *inter alia, Albert,* 790 A.2d at 992 and *In re 1991 Plan,* 609 A.2d at 135).

▪ Generally, in matters filed within a court's appellate jurisdiction, no pleadings (including answers and preliminary objections) may be filed as of right in response to petitions for review. The Rules of Appellate Procedure simply do not contain a provision similar to that in the Rules of Civil Procedure permitting the filing of preliminary objections. *Compare* Pa.R.A.P. 1501 *et seq. with* Pa.R.C.P. No. 1028. Rule 1516 specifically provides that, as to redistricting matters, "[n]o answer or other pleading to an appellate jurisdiction petition for review is authorized, unless the petition for review is filed pursuant to . . . Rule 3321." Pa.R.A.P. 1516(a). Rule 3321 is a narrow exception to Rule 1516, by which this Court may permit filing of an "answer or other pleading" by order. In the appeals before us, our scheduling order noted that we would entertain a substantive answer and brief from the LRC, but we did not authorize the filing of preliminary objections. *See* Order. 1/11/12 (*per curiam* ).

■ This practice is appropriate, as it promotes the salutary purposes embodied in the Rules of Appellate Procedure. These Rules are meant to be "liberally construed to secure the just, speedy and inexpensive determination" of appeals, Pa. R.A.P. 105(a). Re-characterizing these constitutional appeals as challenges sounding in our original jurisdiction would not advance orderly review of these time-sensitive, and often complex, matters. We view the petition for review process in these appeals as putting the Court on notice of the scope of the issues to come before it, inevitably in an accelerated time frame, and in advance of the briefs. The process permits the Court to organize the appeals for purposes of oral argument, and to begin to conduct research on the issues. It would do nothing to advance "the just, speedy and inexpensive determination" of this unique class of appeals to treat the cases as if they were original jurisdiction matters, and thus to open the doors to technical pleading challenges and counter-challenges, and add a layer of complexity to a time-sensitive matter, without illuminating the substantive issues upon which the Court must pass. Accordingly, the *Costa* appellants' Motion to Strike is granted and the LRC's preliminary objections are stricken.

### III. The Appellants and Their Various Claims

#### A. The Citizen Appellants

Our Constitution permits any aggrieved person to file an appeal from the LRC's plan directly to this Court. *See* PA. CONST. art. II, § 17(d). The appeals from the 2011 Final Plan were brought by various registered voters, citizens of the Commonwealth (together, "appellants").

In the lead appeal docketed at 7 MM 2012 (*"Holt "*), the appellants describe themselves as individual voters, registered Democrats and Republicans, hailing from Allegheny, Chester, Delaware, Lehigh, and Philadelphia Counties. Appellants in the appeal docketed at 1 WM 2012 (*"Costa "*) are all twenty Senators elected as Democrats, members of the minority party in the Pennsylvania General Assembly, and registered

voters. Senator Brewster, representing the 45th Senatorial District in the Monongahela Valley, filed a separate "letter brief" in support of the *Costa* appeal.

The appeals in both 2 MM and 3 MM 2012 focus on Chester County. Appellants in 2 MM 2012 *("Comitta")*, are elected officials and resident voters in West Chester Borough, Chester County. Appellants in 3 MM 2012 *("Scoda")* are resident voters and the mayor and a member of the Borough Council, in the Borough of Phoenixville, Chester County.

The separate appeals at 4 MM 2012, 5 MM 2012, and 8 MM 2012 all focus on Delaware County. Appellants in 4 MM 2012 *("Schiffer")* are individual voters from Haverford Township, Delaware County. At 5 MM 2012 *("Coles")*, appellants are individual voters from Upper Darby and Darby Townships in Delaware County. At 8 MM 2012 *("Bradley")*, appellants are individual voters from the Delaware County Boroughs of Collingdale, Darby, Swarthmore, Upper Darby, and Yeadon. Appellant at 6 MM 2012 *("Kim")*, is a councilwoman and voter in the City of Harrisburg, Dauphin County. Appellants in 4 WM 2012 *("Kortz")* are voters from Allegheny, Washington and Lawrence Counties.

Three appellants have filed *pro se* appeals. At 9 MM 2012 *("Baylor")*. appellant is a voter and Township Auditor in Tilden Township, Berks County. At 10 MM 2012 *("Alosi")*, appellant is a resident of the Shippensburg area, in South–Central Pennsylvania. Finally, in the appeal docketed at 17 MM 2012 *("Zayas")*. appellant is a voter in the City of Reading, Berks County.

In all of these appeals, the LRC is appellee. The LRC does not dispute the standing of any of the appellants.

### B. *The Issues Raised by Appellants*

Two of the appeals before us, *Holt* and *Costa*, explicitly raise and develop global challenges premised primarily upon the constitutional ban on dividing counties, municipalities, and wards "unless absolutely necessary." *See* PA. CONST. art. II, § 16. The *Holt* and *Costa* appellants requested that the

Court remand the Plan to the LRC for a second attempt at redistricting in accordance with law. Because the *Holt* claims, and to a lesser extent, the *Costa* claims, form the primary basis for our conclusion that the Final Plan was contrary to law, these claims will be developed further, *infra.* Challengers in three other appeals, *Coles, Kim,* and *Kortz,* adopt the global challenge as developed in the appellants' brief in *Costa.*[15]

The appellants in *Bradley* also adopted the *Costa* brief, but supplemented the argument by highlighting a narrower and localized challenge to the House redistricting plan's division of several Delaware County boroughs: Collingdale, Darby, Swarthmore, Upper Darby, and Yeadon. The *Bradley* appellants allege that the boroughs at issue have substantial minority populations, which share unique, common political interests, but whose political influence is diluted by the unnecessary divisions. In their view, the populations of these boroughs are sufficiently small for each to be kept intact in a redistricting plan. Indeed, Darby, Collingdale, Yeadon and Swarthmore were kept intact in all redistricting plans before 2011. These appellants request remand of the Plan, and express a special interest in maintaining the integrity of the municipalities they address.

Finally, we have six appeals challenging only specific and local divisions of municipalities, in which the appellants, like the *Bradley* appellants in the development of their specific claim, request what would resemble a form of *mandamus* relief. Specifically, the appellants ask for remand of the Final Plan to the LRC with an explicit directive to accommodate their local concerns. Thus, in *Comitta,* appellants object to the division of West Chester Borough, the Chester County seat, into two House districts: under the Final Plan, four wards would remain in the 156th House District, and three wards would be removed from the 156th District and placed into the 160th House District. The *Comitta* appellants re-

15. We note that, after filing separate petitions for review, these appellants did not file separate briefs but joined in and adopted the *Costa* brief; thus, no separate discussion of their appeals is necessary.

quest that this Court order the LRC on remand to maintain the integrity of West Chester Borough and restore it to the 156th House District.

Similarly, in *Scoda*, appellants object to the division of Phoenixville Borough into two House districts: under the Final Plan, four wards would remain in the 157th House District, and three would be removed from the 157th District to the 155th District. Appellants in *Scoda* request remand to the LRC, with a directive to maintain the integrity of Phoenixville Borough and restore it to the 157th House District. The *Comitta* and *Scoda* appellants also both claim that the divisions of West Chester and Phoenixville Boroughs were motivated by partisan politics and by the desire to dilute the voting power of minorities, in violation of the Voting Rights Act of 1965.[16]

In *Schiffer*, appellants state that two Haverford Township wards, Wards 1 and 9, were separated from the rest of the township in the 166th House District and placed into the 163rd House District under the 2011 Final Plan. The *Schiffer* appellants ask the Court to instruct the LRC on remand to assign all of Haverford Township to one district, the 166th House District.

In the *Baylor* matter, the *pro se* appellant asserts that in the four decades since he has been eligible to vote, his hometown of Tilden Township, in Berks County, has never been represented by a Berks County resident in either the Pennsylvania House or the Senate. According to appellant, Tilden Township has also been moved from one House district to another in every reapportionment cycle, which has led to distinctively low levels of political participation by residents. Appellant also argues that Berks County as a whole is excessively, and unnecessarily, divided into nine House districts. Appellant requests remand to the LRC for development of a non-partisan plan that complies with relevant law; appellant suggests redrawing the electoral map based on school district boundaries.

16. 42 U.S.C. § 1973 *et seq.*

The *pro se* appellant in *Alosi* challenges the division of the greater Shippensburg area, which appellant states is a unified community of approximately 25,000 people. The Shippensburg area was formerly contained within the same 89th House District, but under the 2011 Final Plan, it has been divided and placed into three separate House Districts: the 86th District, the 89th District, and the 193rd District. Appellant notes that the Final Plan divides two counties, Adams and Cumberland, and two municipalities, Shippensburg Borough and Southampton Township, and has the effect of diluting the political power of the Shippensburg area. Appellant requests that the Plan be revised to maintain the 89th House District intact or, at a minimum, to remove the division of Shippensburg Borough.

Finally, the *pro se* appellant in *Zayas* complains that the Plan unnecessarily fragments the City of Reading, in Berks County, into two House Districts, the 126th and the 127th, with the intention and effect of reducing the political effectiveness of a rapidly increasing and politically cohesive Hispanic population in Reading. Appellant requests remand for the LRC to conduct reapportionment in accordance with constitutional and federal Voting Rights Act requirements.

In addition to these substantive challenges, the appeals and the responsive brief of the LRC present disputes concerning the Court's scope and standard of review and the burden of proof, as well as requests to explain the status of the law or to reconsider precedent in this area. Appellants address governing precedent from two perspectives. First, some appellants appear to accept the LRC's view of a peculiarly narrow scope and standard of judicial review (a central aspect of the LRC's position, as we will explain below, is that alternative plans are irrelevant), and ask that we reject that precedent as so understood. Along the same lines, other appellants take a more sophisticated approach, which reflects a closer and more accurate reading of our redistricting precedent, to argue, for example, that there is no absolute ban on consideration of alternative redistricting plans in reviewing whether the LRC's Final Plan is contrary to the law. Second, the *Comitta,*

*Scoda, Schiffer, Baylor, Alosi,* and *Zayas* appellants request that we reconsider the requirement, established in our decisional law, that a successful challenger must address the Final Plan as a whole, and revisit the precedent to permit rejection of a final plan based upon a challenge focused only on that plan's effect on a particular political subdivision. *See Albert,* 790 A.2d at 995.

For organizational and decisional purposes, we will address the scope and standard of review, as well as the burden of proof, first; we will then consider the global challenges, and finally the individual challenges.

## IV. The Proper Review Paradigm

### A. Scope and Standard of Review

Redistricting appeals are unlike the great majority of matters upon which we pass in that there is no conventional determination to review, and an atypical party responding to the appeal. The LRC, which devised the Final Plan in the first instance, also has the task of defending its constitutionality against the specific appeals brought by citizens.[17]

17. This was not always so. In the first reapportionment appeals following adoption of the current Pennsylvania constitutional construct, the 1971 Final Plan was defended by the Attorney General. *Commonwealth ex rel. Specter v. Levin,* 448 Pa. 1, 293 A.2d 15 (Pa.1972). The appeals from the 1981, 1991, and 2001 plans all were defended by the LRC itself. Notably, as recently as the 1991 reapportionment appeals, it was not clear precisely what role the LRC should play in response. As Dean Gormley, Executive Director of the 1991 LRC describes the argument in 1992:

> In addressing the mountain of petitions and hastily-drafted briefs, the Commission's counsel adopted the approach of seeking to assist the Court in a somewhat detached and neutral fashion, just as the Solicitor General of the United States is often called upon to wear a dual hat as litigant and advisor to the U.S. Supreme Court. Rather than embrace an aggressive, bent-on-prevailing-on-every-issue approach which would have been the norm for modern litigation, the Chairman and Chief Counsel chose to provide the Court with as much information as possible so that the Court could make rational decisions.... Not only was this approach meant to foster the trust of the Court, but it also reflected the belief of the Chairman himself that the Commission was acting not as a litigant in the typical sense, but as a representative of all citizens of the Commonwealth. Thus, if the Reapportionment Plan was legally defective in any way, the Chair-

The LRC insists on an unusually deferential judicial stance implicating both the scope and standard of review, which it claims rests on settled precedent. As noted, some appellants accept the LRC's interpretation of precedent and request that we overrule it. Other appellants, however, argue that the applicable precedent in fact does not contemplate or require the degree of deference argued by the LRC.

■■ Initially, we note that, although they are often confused or conflated by litigants, the scope of and the standard of review are distinct concepts and are not appropriately substituted for one another. Succinctly stated, "scope of review" refers to "the confines within which an appellate court must conduct its examination," *i.e.*, the "what" that the appellate court is permitted to examine. *Morrison v. Commonwealth*, 538 Pa. 122, 646 A.2d 565, 570 (Pa.1994). "Standard of review" addresses the manner by which that examination is conducted, the "degree of scrutiny" to be applied by the appellate court. *Id.*

### 1. *Scope of Review*

Identifying the proper scope of review is of unusual importance in these appeals because the LRC's core rebuttal to the global arguments forwarded in *Holt* and *Costa* is that this Court's scope of review prevents it from even considering the alternate plans that those appellants provided to the LRC, and have used to make their cases here. The LRC's argument that our scope of review is confined to the four corners of the Final Plan rests upon two pillars. First, the LRC argues a supposed deference due to it because reapportionment is a legislative task, and consideration of alternate plans, for any purpose, "would not only usurp the Commission's constitutional authority to undertake the reapportionment but, more

man believed, the Court should have a chance to determine this for itself so that any defect could be corrected.

Gormley, Legislative Reapportionment, at 55. Of course, we recognize that the LRC has considerable discretion to determine its role in litigation. For better or for worse, the current LRC and counsel have taken a more adversarial litigation approach than their predecessors in 1991.

seriously, make it impossible for the Commission to ever know for certain that its plan will pass constitutional muster." LRC Brief at 30. Second, the LRC argues that this Court's precedent has established that review is limited to the four corners of the Final Plan, and further, that alternative plans posed by objector citizens are irrelevant for any purpose—even for the purpose of showing that a Final Plan is contrary to law.

The LRC's argument on the second point proceeds as follows. The LRC asserts that in this Court's first two reapportionment decisions following the 1968 Constitution, "a majority of the Court specifically rejected the contention that alternative plans should be reviewed—even if only as a measuring device rather than a substitute." *Id.* at 29; 646 A.2d 565. The single citation accompanying this proposition stated as black letter law is the **dissenting** opinion of Mr. Justice (later Chief Justice) Nix in *In re 1981 Plan*, 442 A.2d at 669 (Nix, J., dissenting). The LRC then adds that none of our succeeding cases have questioned or reexamined this scope of review, and we should not now "reject the forty years of precedent upon which the Commission relied in formulating the Final Plan." LRC Brief at 29.

The LRC repeats its claim that we specifically rejected the notion that alternative plans may be considered for any purpose, with slightly more elaboration, by discussing our 1982 decision. The LRC notes that the majority opinion in that 4–3 decision stated that: "to prevail in their challenge to the final reapportionment plan, appellants have the burden of establishing not, as some of the appellants have argued, that there exists an alternative plan which is 'preferable' or 'better,' but rather that the final plan filed by the Pennsylvania Reapportionment Commission fails to meet constitutional requirements." *In re 1981 Plan*, 442 A.2d at 665. On its own, this statement says nothing that would prohibit the Court, as a scope of review matter, from looking to alternate plans in order to assess the constitutionality of the Final Plan. The LRC apparently derives that limitation from the fact that Justice Nix's dissenting opinion offered that, while he agreed that "we do not dismiss a plan because 'fortuitously' another

may have constructed a better one, the fact that a better one may be easily designed which accommodates all of the constitutional concerns may strongly suggest the constitutional invalidity of the selected plan." *Id.* at 669 (Nix, J., dissenting). After quoting Justice Nix, the LRC declares that "[t]hat view was rejected by a majority of the [*In re 1981 Plan* ] Court." LRC Brief, at 29–30. The LRC does not cite where the majority opinion in *In re 1981 Plan* engaged Justice's Nix point, and specifically rejected it.

The *Holt* appellants dispute the LRC's interpretation of the applicable scope of review, arguing that the position that our review is limited to the four corners of the Final Plan is "tantamount to a declaration of non-reviewability." *Holt* Brief at 14. Appellants forward the modest proposition that this Court—like the LRC in its formulation of a Final Plan—may consider alternative plans addressing redistricting as a whole as mere proof or evidence that a substantial number of the Final Plan's political subdivision splits were not "absolutely necessary," as the Constitution requires, and thus the plan as a whole could be deemed to be contrary to law on that basis.

The *Holt* appellants make clear that they do not ask the Court to direct adoption of any of the alternative plans presented to the LRC, including their own. Their point is more nuanced: they embrace Justice Nix's view in dissent, quoted above, that the fact that better plans "may be easily designed which accommodate[ ] all of the constitutional concerns may strongly suggest the constitutional invalidity of the selected plan." *Holt* Brief at 20. Appellants note that this Court has never been presented with an appeal that challenged a prior reapportionment plan in its entirety on grounds of constitutionally excessive subdivision splits and, therefore, we have never held that their approach—offering an alternative plan as evidence or proof that the Final Plan is unconstitutional—violates the established scope of review or is otherwise not viable.[18] The *Costa* appellants agree with the *Holt*

18. Unlike the *Holt* appellants, other appellants either accept the LRC's interpretation or offer a more rudimentary reading of prior redistricting caselaw on the scope of review, colored primarily by the unfavorable

approach, and offer for comparison an alternate redistricting plan that Senator Costa proposed to the LRC, and which the LRC rejected.[19] *See Costa* Brief at 32–33.[20]

As stated, the reapportionment process is outlined in our Constitution, and that charter specifically confers upon "any aggrieved person" the right to appeal "directly to the Supreme Court." PA. CONST. art. II, § 17(d). Section 17(d) goes on to specify a standard of review and the appropriate remedy: "[i]f the appellant [in a redistricting matter] establishes that the final plan is contrary to law, the Supreme Court shall issue an order remanding the plan to the commission and directing the commission to reapportion the Commonwealth in a manner

results obtained by previous challengers. Thus, some appellants interpret our prior caselaw to prohibit any challenges either offering an alternate plan or centering on the absolute necessity of a local political subdivision split. *See, e.g., Schiffer* Brief at 9. Other appellants understand the law as suggesting that this Court will affirm any plan that compares favorably to past redistricting plans in terms of population equality. *See, e.g., Comitta* Brief at 18. These appellants advocate in favor of a broader scope of review, permitting consideration of specific local challenges to prove that the LRC's Final Plan is contrary to law; they request that we overrule any precedent to the contrary. With respect to the relevance of alternate, global plans, our discussion in text, *infra*, provides the answer. Respecting the invitation to revisit our prior, and most recent precedent, requiring that successful challenges encompass the plan as a whole, *see Albert*, 790 A.2d at 995 (in conducting constitutional review, this Court "must examine the final plan as a whole"), we are disinclined to revisit that precedent, particularly given that: (1) we are aware that changes to any one aspect of a plan can cause a ripple effect; (2) the 2011 LRC could fairly rely on the unequivocal "final plan as a whole" language in *Albert*: and (3) the parameters this Opinion is establishing, followed with fidelity, should operate to significantly reduce the number of political subdivisions split by a new plan.

19. Unlike the *Holt* appellants, *infra*, the *Costa* appellants suggest that, upon remand, the LRC should revise the Final Plan by using Senator Costa's alternate plan as a starting point. *Costa* Brief at 34. Our mandate does not require such action.

20. The *Costa* alternate plan creates fewer subdivision splits than the LRC's Final Plan, but more splits than the *Holt* alternate plan. Questioned about this fact at oral argument, counsel for the *Costa* appellants explained that the purpose behind the *Costa* plan was not to suggest the best of all plans, but to show that the core of the Final Plan could be achieved with far less violence to the integrity of political subdivisions. Transcript of Oral Argument, 1/23/12, at 65–66. This point tracks the nuanced approach of the *Holt* appellants.

not inconsistent with such order." *Id.* On its face, the Constitution does not dictate any form of deference to the LRC, it does not establish any special presumption that the LRC's work product is constitutional, and it also places no qualifiers on this Court's scope of review. Absent some other constraint—and we will address the LRC's decisional law argument below—this Court would logically apply the scope of review generally applicable in similar matters.

In this case, the *Holt* and *Costa* alternate plans were presented to the LRC, in part as proof that the LRC's plan was unconstitutional in that it created divisions of political subdivisions that were not "absolutely necessary." In the ordinary case, there would be no reason in law or logic why the Court would not be permitted to look at such material in discharging its constitutional duty to pass upon an appeal.

Indeed, legal challenges in general, and appellate challenges in particular, commonly involve an offering of alternatives. It is not effective advocacy to simply declare that a trial judge's ruling was erroneous; the good advocate addresses what the judge should have done instead. Take, for example, a trial level challenge to a jury instruction. An objection comprised of "Judge, you are wrong," gets a litigant nowhere; the essence of the advocate's function is to go farther and explain how the charge should read—*i.e.*, what was the better alternative. The point is obvious and hardly requires elaboration.

The LRC nevertheless repeatedly states as fact that the majority opinion in *In re 1981 Plan* "specifically" rejected the proposition, forwarded in Justice Nix's dissent, that alternate plans can be relevant proof that a Final Plan is unconstitutional. This is not so, which no doubt explains the LRC's failure to cite a point where, in the majority opinion, the "specific rejection" occurred. Indeed, the majority opinion by Mr. Justice (later Chief Justice) Roberts never once mentions Justice Nix or his dissent, much less the dissent's point that easily produced alternative plans may prove the constitutional invalidity of the selected plan. The majority never once said that alternative plans are irrelevant, cannot be considered, and are beyond the proper scope of review.

Rather, the Court in *In re 1981 Plan* actually said the following. At the outset of the opinion, we adverted to the decisional law of the U.S. Supreme Court concerning the Equal Protection Clause of the Fourteenth Amendment. In discussing that federal decisional law, we noted that the Supreme Court had rejected an equal protection challenge that was bottomed on a claim that a reapportionment plan should be invalidated "merely because the alternative plan proposed by the litigant is a 'better' one." 442 A.2d at 664 (discussing *Gaffney v. Cummings*, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973)). We then quoted *Gaffney*, as follows:

> And what is to happen to the Master's plan if a resourceful mind hits upon a plan better than the Master's by a fraction of a percentage point? Involvement like this must end at some point, but that point constantly recedes if those who litigate need only produce a plan that is marginally 'better' when measured against a rigid and unyielding population-equality standard.

> The point is, that such involvements should never begin. We have repeatedly recognized that state reapportionment is the task of local legislatures or of those organs of state government selected to perform it.

*Id.* at 664–65 (quoting *Gaffney*, 412 U.S. at 750–51, 93 S.Ct. 2321). Notably, in *Gaffney*, the U.S. Supreme Court was setting out its command for the role that federal courts should take in reviewing federal law challenges to state redistricting plans. The *Gaffney* Court was not, and could not, speak to the review conducted by state courts facing hybrid challenges sounding under both federal equal protection and additional state constitutional mandates.

Immediately after our quotation from *Gaffney*, respecting equal protection, we stated that: "Thus, to prevail in their challenge to the final reapportionment plan, appellants have the burden of establishing not, as some of the appellants have argued, that there exists an alternative plan which is 'preferable' or 'better,' but rather that the final plan filed by the Pennsylvania [Legislative] Reapportionment Commission fails to meet constitutional requirements." *In re 1981 Plan*, 442

A.2d at 665. Although we did not explain ourselves further, it appears that we found that the core principle of *Gaffney* respecting equal protection claims was persuasive in guiding our own, broader review of redistricting plans. We did not, however, announce that the *Gaffney* principle altered our scope of review, *i.e.*, we did not state that the parties were forbidden to argue, and the Court was forbidden to consider, alternate plans in assessing the constitutional validity of the Final Plan. All we stated was that the mere existence of a plan described as being "preferable" or "better" did not alone suffice to prove the unconstitutionality of the approved plan. This observation implicates a standard of review, not the scope of review. *Cf. Perry v. Perez*, 565 U.S. ——, 132 S.Ct. 934, 941–44, 181 L.Ed.2d 900 (2012) (cases hold only that district court may not adopt unprecleared plan as its own; they do not prohibit use or discount value of such plan to aid drawing of interim map). Under this principle, the Court rejected challenges that proposed marginal increases in population equality of districts, as well as piecemeal challenges to splits of subdivisions; it did not reject a claim, such as the global one forwarded by the *Holt* and *Costa* appellants here, that alternate plans have been generated which prove that the adopted plan is constitutionally infirm.

The LRC's theory that we adopted a scope of review prohibiting consideration of alternatives seems to proceed upon the assumption that points raised in a dissent are necessarily and affirmatively "rejected" by the Court majority—even if the majority never discussed or rebutted the point. This is a strange theory indeed. First of all, a Court's silence on a point is of far less import than *dicta,* and it is settled that *dicta* has no binding effect. *See, e.g., Albright v. Abington Mem. Hosp.*, 548 Pa. 268, 696 A.2d 1159, 1167 n. 8 (Pa.1997).

Second, a Court majority is not required to respond to every issue addressed by a dissenting opinion. Indeed, any judge of sufficient tenure has experienced the phenomenon of the ignored concurrence or dissent. A Court majority's silence on a point raised by a dissent cannot be read as a "specific" rejection of a particular position taken by a dissent,

and it certainly cannot be so read where the dissent's point is not independently addressed in the majority opinion. The better and logical interpretation of the majority's silence in *In re 1981 Plan*, when that case is read against its facts and the specific legal challenges the majority discussed, is that the majority did not deem the dissent's point to be at issue, since the claim forwarded there was not that alternative plans showed that the final plan was contrary to law, but that some appellants alleged that they had "preferable" or "better" plans.

In short, neither the Court's opinion nor Justice Nix's dissent in *In re 1981 Plan* remotely supports the LRC's contention that this Court has, in prior opinions, limited its scope of review to the four corners of the Final Plan. Moreover, the notion is particularly unsustainable because the LRC itself does not abide by it. Rather, the LRC repeatedly looks outside the four corners of its Final Plan to defend against the instant challenges; indeed, a core position of the LRC, which we discuss below, is that this Final Plan is lawful because it stands up well when measured against prior plans which survived discrete constitutional challenges. In arguing that other, alternate plans are relevant proof of the infirmity of the 2011 Final Plan, the appellants do no less than the LRC does.

This Court is not required to "reverse [sic] four decades of precedent" as the LRC claims, LRC Brief at 30, to hold that alternate plans may help to prove constitutional infirmity, because the LRC reads into our cases a restriction on the scope of review that does not exist and is contrary to settled notions of litigation and judicial review. It necessarily follows that the LRC cannot claim justifiable reliance upon a truncated scope of review which arises from a misreading of prior decisional law. We are also not persuaded by the LRC's claim that its existence and task requires that we deem alternative plans to be irrelevant and beyond our scope of review. The Constitution confers upon aggrieved citizens a **right** of appeal, measured by substantive standards specified in the charter. Such appeals must be meaningful, not illusory. The importance and difficulty of the LRC's task—a common burden in

government—does not insulate its undertaking from the normal avenues of legal challenge, including arguments premised upon alternatives.

 Nor does our holding diminish our recognition that the Constitution placed the task of devising a redistricting plan within the bailiwick of the partisan leadership of the legislative branch, in recognition of the General Assembly's "expertise in reapportionment matters." *In re 1981 Plan,* 442 A.2d at 665. But, equally true is that the same provision of the Constitution placed the task of resolving appeals alleging that the LRC's Plan is "contrary to law" within the bailiwick of the judicial branch, in recognition of this Court's expertise in these such matters. The retention of legislative expertise is accomplished by the fact that the Constitution prescribes remand to the LRC if a Final Plan is found to be contrary to law. We, therefore, reject the LRC's foundational and pervasive argument that we have already adopted, or should adopt, a scope of review that limits our consideration to the four corners of the Final Plan. Our scope of review in these appeals is plenary, subject to the restriction, recognized in *Albert,* that a successful challenge must encompass the Final Plan as a whole, and the recognition in our prior cases that we will not consider claims that were not raised before the LRC. *In re 1981 Plan,* 442 A.2d at 666 n. 7. This entails consideration of all relevant evidence, and legal authority, that a Final Plan is contrary to law.

### 2. *Standard of Review*

 On appeal from a Final Plan, the plan may be found to be unconstitutional only if the appellant establishes that it is "contrary to law." PA. CONST. art. II, § 17(d) ("If the appellant establishes that the final plan is contrary to law, the Supreme Court shall issue an order remanding the plan to the commission . . . ."). The primary "law" at issue consists of the constitutional imperatives set forth in Section 16. PA. CONST. art. II, § 16 (number of districts; compact and contiguous territory; districts as nearly equal in size as practicable; no divisions of county, city, incorporated town, borough, township or ward,

unless absolutely necessary). The appeals *sub judice* present precisely such challenges. The proper construction of constitutional language (or statutory language for that matter) is a question peculiarly suited to the judicial function. The task involves purely legal questions, framed by settled rules of interpretation. Such issues of law typically are subject to *de novo* or plenary review, and indeed the parties agree that our review is non-deferential. Generally, in conducting *de novo* review, this Court corrects legal errors without deference to the judgment of the tribunal, agency, or other entity whose determination is challenged, as to the constitutionality of its actions. *Pennsylvania Tpk. Comm'n v. Commonwealth*, 587 Pa. 347, 899 A.2d 1085, 1094 (Pa.2006) (constitutional challenge poses question of law; therefore, review is plenary and non-deferential); *Pap's A.M. v. City of Erie*, 571 Pa. 375, 812 A.2d 591, 611 (Pa.2002) (this Court's decision is final word on meaning of Pennsylvania Constitution); *see also Hertz Drivurself Stations v. Siggins*, 359 Pa. 25, 58 A.2d 464, 469 (Pa.1948) ("But, equally well settled, federally, since *Marbury v. Madison*, 1 Cranch 137, 175–180, 2 L.Ed. 60 (1803), and for Pennsylvania even a few years earlier, is the rule that a law repugnant to the constitution is void and that it is not only the right but the duty of a court so to declare when the violation unequivocally appears. *See Respublica v. Duquet*, 2 Yeates 493, 501 (1799); *cf. also Eakin v. Raub*, 12 Serg. & Rawle 330, 339 (1825).").

 Notwithstanding its recognition that our standard of review ultimately is *de novo*, the LRC suggests, throughout its brief, that our review in fact is constrained both by the legislative nature of the LRC's task and our prior precedent. Respecting the first point, the LRC essentially asks that we review the constitutionality of the Final Plan in accordance with the standards applicable to acts of the General Assembly. A statute, of course, is generally entitled to a strong presumption of constitutionality. The presumption "reflects on the part of the judiciary the respect due to the legislature as a co-equal branch of government." *Sch. Dists. of Deer Lakes & Allegheny Valley v. Kane*, 463 Pa. 554, 345 A.2d 658 (Pa.1975).

However, as the *Holt* appellants note, the LRC is composed of four leaders of the General Assembly, and is not the General Assembly itself. The *Holt* appellants thus argue that the Final Plan is not entitled to the same presumption of constitutionality that is accorded to bills adopted by a majority of duly elected representatives to the General Assembly and signed by the Governor into law. Appellants urge the Court to avoid an "unduly passive role" in reviewing the LRC's Plan. *Holt* Brief at 26–27 (quoting *Albert,* 790 A.2d at 1000 (Saylor, J., concurring, joined by Castille and Eakin, JJ.)).

 We agree with the *Holt* appellants that a Final Plan approved by the LRC is not entitled to a presumption of constitutionality. First of all, nothing in Article II, Section 17 requires such deference. The LRC's task certainly affects the Legislature, and the essence of the task may be legislative in nature.[21] But, the Chairman of the LRC is not required to be a member of the General Assembly; in point of fact, the Chairman of the 2011 LRC is not a legislator; and none of the

---

**21.** Notably, prior to the Constitution of 1968, the task of redistricting Pennsylvania's legislative districts indeed fell to the General Assembly as a whole. *See* Gormley, Legislative Reapportionment, at 4–7. In practice, however, that body often failed to discharge its responsibility; indeed, it had failed to conduct a successful redistricting in over four decades. Some of this inertia may be attributed to partisan deadlock, but there is also an extent to which it simply reflected the reality that redistricting could mean some members would lose their seats. *Id.* at 7–9, 11; 790 A.2d 989. This legislative failure, combined with then-recent decisions of the U.S. Supreme Court newly interpreting the Equal Protection Clause as requiring states to address apportionment concerns along lines of population equality, and the recognition that courts were empowered to rule on such reapportionment arrangements, led the 1968 Pennsylvania Constitutional Convention to adopt a new scheme. The result was the creation of the LRC, comprised of the four leaders of the Pennsylvania House and Senate and a "neutral chairman." The decision to constitute that hybrid body, rather than enlisting the General Assembly itself, was a deliberate one. "[T]he [Reapportionment Committee of the Convention] avoided the creation of a purely political body. The proposed commission represented a compromise between allowing the legislature as a body to reapportion itself ..., and taking the process entirely out of the hands of that body ... which possessed the greatest expertise for this task. If this new hybrid commission failed to enact a lawful reapportionment plan within the prescribed time limits, the ultimate 'tie-breaker' would be the Pennsylvania Supreme Court, just as it had been in 1964–1966." *Id.* at 10–11; 790 A.2d 989.

current Chairman's predecessors were then-current members of the General Assembly. In addition, the Final Plan, the LRC's challenged product, is not an act of the General Assembly, *i.e.*, it was not a bill subject to legislative disclosure and debate, a general vote, adoption and presentation to the Governor for approval, or passage by a super-majority if vetoed. There is no basis for indulging a presumption of constitutionality in these circumstances. The most that can be said is that the Final Plan enjoys the same status as any action or decision where the challenging party bears the burden; and here, the burden is upon appellants to show that the plan is contrary to law.[22]

Respecting the second point, the LRC states that it has viewed this Court's prior decisions passing upon redistricting challenges as setting guideposts for acceptable levels of population deviation and political subdivision splits. The LRC argues that its Final Plan should be measured against prior plans "approved" by this Court. In the LRC's view, a Plan that measures favorably with (*i.e.*, one that does not drastically depart from) past redistricting plans necessarily must be approved. The LRC argues that allowing a redistricting plan to be proved "contrary to law" by comparing it to proffered alternative plans invites an interminable search for the "better" or "best" plan, that would "create a jurisprudence of doubt and render future [legislative reapportionment commissions] unable to rely on precedent [to] draft a reapportionment plan with any confidence in its constitutionality." LRC Brief at 32–33. The LRC decries such an approach as leaving redistricting to a computer rather than to "the duly-appointed members of the [LRC]." *id.* at 31 n. 16; 790 A.2d 989.

22. Our holding that the Final Plan is not entitled to a presumption of constitutionality does nothing to diminish the LRC's overall discretionary authority to redistrict the Commonwealth. As we make clear *infra*, our decision in this case does not command the LRC to devise particular benchmarks in terms of the number of subdivision splits, the extent of deviation in population equality, or the parameters of compact and contiguous districts. This paradigm recognizes the difficulty in the LRC's task and still reposes considerable discretion in its judgment.

The *Holt* appellants respond that the Final Plan is reviewed by the Court to ensure that it is not contrary to law—a burden upon challengers that, in appellants' view, is not heavy. According to appellants, if a Final Plan "ignores a legal mandate . . . without explanation and justification in the law," the Plan is contrary to law. *Holt* Brief at 11. The *Holt* appellants distinguish our prior redistricting cases and argue that "[t]his Court's approval of prior reapportionment plans has no bearing on the present [appeal]." *Id.* at 25; 790 A.2d 989.

Thus, the LRC concludes that our *de novo* review is to be constrained by the specifics of prior reapportionment plans "approved" by the Court. In essence, the LRC understands our prior decisions as pre-approving the levels of population deviation and the number of split political subdivisions that were "approved" in prior redistricting appeals. In contrast, appellants understand the governing "law" to mean applicable constitutional and statutory provisions and on-point decisional law, such as *Albert.* We agree with appellants.

The Constitution neither authorizes nor requires this Court to engage in its own *de novo* review of redistricting plans in order to assure that all constitutional commands have been satisfied. Thus, our prior "approvals" of plans do not establish that those plans survived not only the challenges actually made, but all possible challenges. Instead, in the prior redistricting appeals, this Court merely passed upon the specific challenges that were made. We decided the issues presented to us.

It is significant that the Constitution does not always require this Court's *imprimatur* before a redistricting plan can become final: if "the last day for filing an appeal has passed with no appeal taken," the Final Plan automatically attains "the force of law." PA. CONST. art. II, § 17(e). This Court has a role if, and only if, a citizen or citizens file an appeal from the Final Plan. *See* PA. CONST. art. II, § 17(d)-(e). Unlike some other states,[23] Pennsylvania's redistricting process does

23. *See, e.g.,* COLO. CONST. art. V, § 48(1)(e) (after reapportionment commission finalizes its plan it shall submit it to Colorado Supreme Court for review).

not command *sua sponte* judicial review by the Court of a redistricting plan, although it certainly could have done so.

 In short, the current Final Plan is not insulated from attack by decisions of this Court finding prior redistricting plans constitutional, unless a materially indistinguishable challenge was raised and rejected in those decisions.[24] *See, e.g., Commonwealth v. Garzone*, 34 A.3d 67, 77–78 (Pa.2012) (court's language must be read against legal question at issue and operative facts). Our review of our precedent reveals that no decision of this Court has purported to establish, or "grandfather in," any particular maximum level of population deviation; nor has any decision held that a certain number of political subdivision splits is constitutional, irrespective of the constitutional challenge being forwarded in challenging those splits.

Indeed, the Court has shied away from such broad pronouncements, which would be in the nature of *obiter dicta.* Thus, in *In re 1981 Plan*, in addressing the substantial equality of population challenge before the Court, the Court noted that it was not the judiciary's responsibility to decide "the precise mathematical formula to be applied in dividing the population of the state among legislative districts" and rejected as invalid the premise that any "predetermined percentage deviation [existed] with which any reapportionment plan [had to] comply." 442 A.2d at 667. The Court also expressed the concern that setting a predetermined population equality standard "might well interfere with the [redistricting c]ommission's ability to achieve the goals of compactness and preservation of subdivision lines." *Id.* at 667–68.

In its redistricting jurisprudence, this Court has not purported to set any immovable "guideposts" for a redistricting commission to meet that would guarantee a finding of consti-

24. This is a bedrock rule of jurisprudence involving precedent and *stare decisis,* and it is not a difficult rule to apply. For example, in *Albert,* we held that a reapportionment challenge could not succeed unless it addressed the Final Plan as a whole. Absent a reconsideration and rejection of that holding, localized challenges simply cannot succeed; and, indeed, we are enforcing the restriction and declining to reconsider *Albert, See* n. 18, *supra.*

tutionality, as against challenges premised upon population equality, subdivision splits, compactness, or contiguity. The LRC's reliance on prior cases as creating an expectation that its Final Plan would be found constitutional, is untenable. The "guideposts" to which a redistricting commission is bound are the U.S. Constitution, the Pennsylvania Constitution, and this Court's relevant, specific holdings. We do not doubt that the LRC made a good faith effort to fit the population deviation and political subdivision splits in the current Final Plan within the factual parameters of the prior plans; but nothing in our decisions in the prior cases, and nothing in bedrock jurisprudence, created an expectation that such an effort was "pre-approved." Instead, the polestar for the LRC remained, as always, the command of the people, conveyed in express terms in Article II, Section 16 of the Pennsylvania Constitution.

### B. *Burden of Proof*

The parties' dispute regarding the burden of proof is relatively diffuse but nonetheless important. The LRC's position is that appellants have the burden to demonstrate that the plan is contrary to law. LRC Brief at 15 (citing *In re 1991 Plan*, 609 A.2d at 136). The LRC notes that, unlike other state charters, our Constitution does not authorize this Court to automatically review a redistricting plan, irrespective of any objections or challenges, or to adopt rules for the production and presentation of evidence in support of the plan. *See* LRC Brief at 33–34 n. 18 (comparing PA. CONST. art. II, § 17(d) with COLO. CONST. art. V, § 47(2)). Accordingly, in the LRC's view, the burden is not on the redistricting commission, as in those other jurisdictions, where the commission's actions are more closely and automatically scrutinized. *Id.*

Several appellants argue that the LRC either is or should be required to explain or justify aspects of the Final Plan. Thus, the *Holt* appellants argue that the Final Plan violates the Constitution "by failing to offer any 'specific explanation for why the constitutional prerequisites of compactness and respect for political subdivisions cannot be accommodated

simultaneous [sic] with the maintenance of substantial equality of population and enforcement of voting interests of protected groups in the manner prescribed by federal law.' " *Holt* Brief at 24 (quoting *Albert*, 790 A.2d at 1000 (Saylor, J., concurring)). Appellants in *Costa* suggest that the LRC should be required to "offer some demonstration of 'necessity' " once an alternative plan is offered that identifies unnecessary subdivision splits. According to the *Costa* appellants, the LRC should have justified each division or eliminated such division from the Final Plan, rather than relying on generic assertions that respect for subdivision boundaries could not be accommodated. *Costa* Brief at 32. In a similar vein, but with a more direct approach, the *Schiffer* appellants ask the Court to consider alternate plans as *prima facie* proof that a particular political subdivision split was not absolutely necessary; the burden would then shift to the LRC "to show cause why [the Final P]lan was absolutely necessary." *Schiffer* Brief at 10.

On this point, we agree with the LRC. The plain language of the Constitution requiring appellants to establish that the Final Plan is contrary to law does not leave the door open for a shift of the burden of production or persuasion to the LRC. Moreover, the assignment of the burden of proof to the appellants is consistent with the rest of the Section 17 process, including the provision that the Final Plan shall have the force of law if no appeal is taken. PA. CONST. art. II, § 17(e).

▮▮▮▮ The LRC may, of course, respond to the challengers' allegations in the briefing process, offering explanations for its various decisions, as it has done in some instances here. In addition, the LRC may want to consider a process in its development of a Final Plan where it provides explanations, or responds to objections; whether to do so, however, would appear to be a matter reposed in its discretion. But, shifting the burden of proof is unnecessary. The burden is squarely on appellants, in accordance with the constitutional mandate; and the LRC has a full opportunity, in the briefing process, to provide explanations.

## V. *The Governing Law*

In the Pennsylvania redistricting scheme, the LRC has a constitutional duty to formulate a Final Plan that complies with law. Considerable discretion is reposed in the LRC to accomplish this task, which requires a balancing of multiple mandates regarding decennial districting, derived from federal and state law, most of which are of organic, constitutional magnitude. The central difficulty of the LRC's task arises not only because of the political and local interests that are affected by any change in the existing scheme, but also because accommodating one command can make accomplishing another command more difficult.

The operative mandates under Article II, Section 16 are to devise a legislative map of fifty senatorial and 203 representative districts, compact and contiguous, as nearly equal in population "as practicable," and which do not fragment political subdivisions unless "absolutely necessary." Although all of these commands are of Pennsylvania constitutional magnitude, one of the factors, that districts be "as nearly equal in population as practicable," also exists as an independent command of federal constitutional law, including decisional law which changes and evolves. *Commonwealth ex rel. Specter v. Levin*, 448 Pa. 1, 293 A.2d 15, 18 (Pa.1972) (*"Specter"*) (citing U.S. CONST. amend. XIV, § 1 ("No State shall ... deny to any person within its jurisdiction the equal protection of the laws."))[25] Below, we address the developments in federal and state decisional law that govern, and complicate, our analysis of the citizen appeals before the Court.

**25.** Other mandates, not relevant to our disposition here, but important to the LRC's task, are the Fifteenth Amendment and the Voting Rights Act of 1965. *See* U.S. CONST. amend. XV, § 1 ("The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."); 42 U.S.C. § 1973 ("No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title [relating to members of language minority group]....").

## A. *The Federal Overlay of Redistricting*

Although state legislative redistricting is primarily a question of state law, the federal equal protection overlay is of substantial effect, and it indeed has significantly affected our decisional law under Article II, Section 16. Familiarity with the background and interplay is important to understanding the issues before us.

In *Colegrove v. Green*, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946), three Illinois voters challenged the extant Congressional district apportionment in that state as invalid under federal apportionment statutory law and the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution. The appellants argued that the apportionment scheme no longer provided sufficient representation for urban areas where population had expanded significantly during the course of the twentieth century, while rural areas that had lost population retained representative power that increasingly outstripped their declining populations. The High Court declined to engage itself, finding "this issue to be of a peculiarly political nature and therefore not meet for judicial determination.... It is hostile to a democratic system to involve the judiciary in the politics of the people." *Id.* at 552–54, 66 S.Ct. 1198.

Concurring in the *Colegrove* result, Justice Rutledge wrote: "There is not, and could not be except abstractly, a right of absolute equality in voting. At best there could be only a rough approximation." *Id.* at 566, 66 S.Ct. 1198 (Rutledge, J., concurring). In dissent, Justice Black, joined by Justices Douglas and Murphy, pointed out that the Illinois districting scheme at issue had been established in 1901 and included Congressional districts ranging in population from roughly 100,000 to 900,000; but the legislative authorities in the state benefitted from the scheme and therefore ensured perpetuation of inequitable apportionment. The dissent viewed the facts presented as "a wholly indefensible discrimination" forbidden by the Equal Protection Clause, which the dissent would have found to be the basis of a cognizable cause of action. *Id.* at 566–74, 66 S.Ct. 1198 (Black, J., dissenting).

In 1960, the High Court decided *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), a case primarily involving the right to vote secured by the Fifteenth Amendment. Writing for a unanimous Court, Justice Frankfurter rejected the position of city and county authorities that claims of blatant racially discriminatory redistricting in Tuskegee, Alabama, fell within the discretionary power of local government. Although recognizing that political power was at issue, the Court held that when "the inescapable human effect of this essay in geometry and geography is to despoil [citizens] of their theretofore enjoyed voting rights," the matter entered the constitutional sphere and could be subject to judicial disposition. *Id.* at 347–48, 81 S.Ct. 125. Later, in 1962, *Colegrove* was largely negated in the landmark decision in *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), where the Court held that allegations that a state apportionment action deprived voters of equal protection of the laws in violation of the Fourteenth Amendment were justiciable and therefore within the sphere of judicial engagement. What followed was as new and dynamic in the voting rights sphere as was the Warren Court's contemporaneous revolution of criminal procedure throughout the land.[26] This new jurisprudence interpreted and gave concrete meaning to the Equal Protection Clause, and effectively changed the elective systems of virtually all of the states, as well as the U.S. House of Representatives. *See Butcher v. Bloom,* 420 Pa. 305, 216 A.2d 457, 460–63 (Pa.1966) (*Butcher II* ) (Bell, C.J., concurring).

Shortly after *Baker v. Carr,* the Court developed the concepts of "one person, one vote" and the "equal population principle." The language first arose in *Gray v. Sanders,* 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), where the Court disapproved Georgia's use of a "county unit system" to count votes in primary elections for certain statewide offices. The

26. *See, e.g., Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969); *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081(1961).

Court found that Georgia's weighting of each county's votes equally, regardless of population differential, violated equal protection, memorably noting that: "The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments, can mean only one thing—one person, one vote." *Id.* at 381, 83 S.Ct. 801. In *Wesberry v. Sanders,* 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), the Court considered the constitutionality of Georgia's apportionment scheme for federal Congressional districts, which resulted in one district of less than 300,000 in total population, and another district with more than 800,000 in total population. The Court concluded that Georgia's scheme unconstitutionally discriminated against voters in more densely populated districts, noting that: "While it may not be possible to draw congressional districts with mathematical precision, that is no excuse for ignoring our Constitution's plain objective of making equal representation for equal numbers of people the fundamental goal for the House of Representatives. That is the high standard of justice and common sense which the Founders set for us." *Id.* at 18, 84 S.Ct. 526.

*Gray* was not an apportionment case, however, and *Wesberry* addressed federal Congressional districting issues. The two concepts of "one person, one vote" and the "equal population principle" became woven together in the state legislature apportionment context in the Court's landmark decision in *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). In *Reynolds,* the Court addressed an equal protection challenge to proposed plans for reapportionment of both houses of the Alabama Legislature. The facts in *Reynolds* revealed that due to decades of non-reapportionment, for example, rural counties having as low as 13,462 in total population retained two seats in the Alabama House, but Mobile County, which includes the City of Mobile and had a total population exceeding 300,000, was allotted only three seats. The federal district court concluded that the scheme in Alabama led to disparities in which votes in less-populated rural senatorial districts were effectively "worth" fifteen to twenty times as

much as votes cast in more densely populated and rapidly urbanizing districts. In an 8–1 opinion by Chief Justice Warren, the Court held: "Population is, of necessity, the starting point for consideration and the controlling criterion for judgment in legislative apportionment controversies.... The Equal Protection Clause demands no less than substantially equal state legislative representation for all citizens...." *Id.* at 567–68, 84 S.Ct. 1362.

Having so concluded, the Court held that, to ensure the right of voters to have their votes "weighted equally," each house of a state legislature must be apportioned on what the Court termed "a population basis": "[T]he Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." 377 U.S. at 577, 84 S.Ct. 1362. While recognizing that absolute or exact equality of population would be impossible, the Court expressed that apportionment schemes must still be based "substantially" on the principle of population equality, which was not to be "diluted in any significant way" by a given plan. *Id.* at 578, 84 S.Ct. 1362.

But, the *Reynolds* Court recognized that the task was not so simple. Thus, the Court continued that, within limits, a State's desire to maintain the integrity of various political subdivisions and to provide for compact districts of contiguous territory is a legitimate and constitutionally valid countervailing interest. The Court noted that, "[i]ndiscriminate districting, without any regard for political subdivision or natural or historical boundary lines, may be little more than an open invitation to partisan gerrymandering." *Id.* at 578–79, 84 S.Ct. 1362. To allow for achievement of legitimate goals such as subdivision integrity in apportioning state legislative districts, the Court held that some deviations from the equal population principle may be permissible under federal law. Nevertheless, "the overriding objective [in redistricting] must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State." *Id.* at 579, 84

S.Ct. 1362. The Court continued that, if the "result" of a "clearly rational state policy of according some legislative representation to political subdivisions" is to submerge population as the controlling consideration, "then the right of all of the State's citizens to cast an effective and adequately weighted vote would be unconstitutionally impaired." *Id.* at 581, 84 S.Ct. 1362; *see also Lucas v. Forty–Fourth Gen. Assembly of Colorado*, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964) (striking down state legislative scheme for failing to provide adequate justification for substantial disparities from population-based representation in allocation of Senate seats to disfavored populous areas).

Again, however, the jurisprudence, which evolved through case-specific challenges, was dynamic. Not long after *Reynolds*, the Court began to express a less restrictive approach to the population equality principle when certain countervailing circumstances were presented. Thus, in *Abate v. Mundt*, 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971), the Court considered a plan to reapportion Rockland County in New York State. When compared with ideal population equality for each of the five districts within the county, the total deviation amounted to 11.9%. Writing for the Court, Justice Marshall reiterated that population equality remained crucial, but opined that "the particular circumstances and needs of a local community as a whole may sometimes justify departures from strict equality." *Id.* at 185, 91 S.Ct. 1904. Later, in *Mahan v. Howell*, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973), the Court reviewed and upheld a plan created by the Virginia state assembly to reapportion both of its legislative houses in which political subdivisions were largely left intact, but the total deviation from ideal population equality was 16.4% in the Virginia House of Delegates. The Court recognized that "broader latitude" may be permissible in state apportionment matters, when considerations such as the integrity of political subdivisions are at issue: "The State can scarcely be condemned for simultaneously attempting to move toward smaller districts and to maintain the integrity of its political subdivision lines." *Id.* at 322, 327, 93 S.Ct. 979.

Notably, in a footnote, the *Mahan* opinion described maintenance of subdivision integrity and providing for population equality as a "dual goal" that the Virginia plan managed to satisfy on both counts. *Id.* at 328 n. 9, 329, 93 S.Ct. 979.

Finally, in *Gaffney, supra,* the Court considered a reapportionment plan based on 1970 census data and prepared by an eight-member bipartisan commission and then a three-member board, both of which were appointed by the leadership of Connecticut's General Assembly. The Connecticut state Constitution provided that within the bounds of federal constitutional standards, division of towns (Connecticut's basic unit of local government) with regard to state house districts was not permitted except in narrow express circumstances. The Court critiqued apportionment approaches that would slavishly labor under an "unrealistic overemphasis on raw population figures" such that relevant and legitimate factors and interests that states must account for are submerged. 412 U.S. at 749, 93 S.Ct. 2321. The Court stressed that the work of state apportionment authorities tasked with state legislative redistricting need not be rejected solely on the basis of deviations from population equality: "We doubt that the Fourteenth Amendment requires repeated displacement of otherwise appropriate state decisionmaking in the name of essentially minor deviations from perfect census-population equality that no one, with confidence, can say will deprive any person of fair and effective representation in his state legislature." *Id.*

Subsequent cases handed down on this issue by the High Court have not established any rigid standards as to what level of deviation from absolute population equality violates the Equal Protection Clause; the analysis is fact specific.[27]

27. *Compare Chapman v. Meier,* 420 U.S. 1, 22, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975) (20% variance not justified by absence of electorally victimized minorities, sparseness of North Dakota's population, division of state caused by Missouri River, or by asserted state policy of observing geographical boundaries and existing political subdivisions, especially when it appears that other, less statistically offensive, reapportionment plans already devised are feasible) *with Brown v. Thomson,* 462 U.S. 835, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983) (in view of Wyoming's constitutional policy of preserving county boundaries and in view of absence of any hint of arbitrariness or discrimination, reapportionment

B. *Pennsylvania Law*

1. *The Legal Landscape before the U.S. Supreme Court's Equal Protection Decisions*

Apportionment has been part of Pennsylvania's constitutional apparatus as far back as the first state Constitution following independence, which was adopted in 1776 during the American Revolution. The prior, provincial arrangement had resulted in the longer-established eastern and coastal areas of Pennsylvania enjoying over-representation at the expense of the less populated but rapidly growing western portions of the state; the new arrangement recognized and rectified this imbalance by adding new western representatives and setting forth the principle that apportionment be derived in proportion to taxable inhabitants. *See generally* Gormley, Legislative Reapportionment, at 4–6. Respecting the Pennsylvania Senate, as early as the Constitution of 1790, and carried forward into the Constitutions of 1838 and 1874, was a requirement respecting the integrity of political subdivisions, at least at the County level: "neither the city of Philadelphia nor any county shall be divided in forming a district." 1790 PA. CONST. art. I, § 7; 1838 PA. CONST. art. I, § 7 (as amended). The task of reapportionment fell to the legislature.

The 1874 Pennsylvania Constitution shifted the measure of proportionality from taxable inhabitants to total population, while the task of reapportionment remained in the hands of the General Assembly, which was newly required to conduct a reapportionment after each U.S. decennial census. 1874 PA. CONST. art. II § 18. The section on apportionment of the Senate mandated that: "The State shall be divided into fifty senatorial districts of compact and contiguous territory, as nearly equal in population as may be, and each district shall be entitled to elect one Senator." 1874 PA. CONST. art. II, § 16. Section 16 also required respect for the integrity of political subdivisions: "No ward, borough or township shall be divided

which permitted county with population of only 2,924 persons to have its own representative, though ideal apportionment would have been 7,337 persons per representative, did not violate Equal Protection Clause).

in the formation of a district." *Id.* The provision respecting apportionment of the House was considerably more complicated, but included mandates respecting proportional representation, and compact and contiguous territory. 1874 PA. CONST. art. II, § 17.[28] Despite the command that reapportionment occur every ten years, in fact, reapportionment in the Commonwealth remained sporadic and, over the decades, lesser populated districts increasingly enjoyed representation far beyond their actual population numbers.

### 2. *This Court's Response to Reynolds and the 1968 Constitutional Revisions*

In the wake of the then-recently issued *Reynolds* decision, this Court first addressed state legislative apportionment in *Butcher v. Bloom*, 415 Pa. 438, 203 A.2d 556 (Pa.1964) (*"Butcher I "*). The unanimous decision by Justice Roberts noted the high stakes at the outset:

This suit challenges the recent Pennsylvania Reapportionment Acts and the election of state senators and representatives thereunder. More importantly, it challenges—in light of recent decisions interpreting the Constitution of the United States—the validity of certain provisions of the Constitution of Pennsylvania which establish the legislative branch of government. It presents one of the most impor-

**28.** Article II, Section 17 provided:

**Representative districts.**
The members of the House of Representatives shall be apportioned among the several counties, on a ratio obtained by dividing the population of the State as ascertained by the most recent United States census by two hundred. Every county containing less than five ratios shall have one representative for every full ratio, and an additional representative when the surplus exceeds half a ratio; but each county shall have at least one representative. Every county containing five ratios or more shall have one representative for every full ratio. Every city containing a population equal to a ratio, shall elect separately its proportion of the representatives allotted to the county in which it is located. Every city entitled to more than four representatives, and every county having more than one hundred thousand inhabitants shall be divided into districts of compact and contiguous territory, each district to elect its proportion of representatives according to its population, but no district shall elect more than four representatives.
1874 PA CONST. art. II, § 17.

tant constitutional questions ever raised in the history of this Commonwealth. It involves the basic rights of the citizens of Pennsylvania in the election of their state lawmakers. Historically and logically, this Court is the most appropriate forum to determine the issues presented and to fashion suitable remedies. Proper and continuing respect for federal-state judicial relationships necessitates consideration by the Supreme Court of Pennsylvania of the relevant state statutes and state constitutional provisions, subject, of course, to review by the Supreme Court of the United States.

*Id.* at 559–60.

We then found that the General Assembly's apportionment legislation of 1964 contained such dramatic deviations from the goal of substantially equal population, as newly announced by the U.S. Supreme Court, among both Senate and House districts, that the apportionment violated the Fourteenth Amendment. *Id.* at 564, 567. Part of the problem with the 1964 plan, as explained by this Court, was the vestigial practice of allocating at least one representative to each county in the state regardless of the county's population. Relying on language in *Reynolds*, this Court held that the historic practice could no longer continue because it so clearly resulted in unequal representation dynamics in both state houses: "[A]ssignment of one seat to each county, regardless of population, results in the submergence of population as the controlling consideration in apportionment and is offensive to the Fourteenth Amendment to the Constitution of the United States." *Id.* at 566. Notably, while we recognized that the "population principle" set forth in *Reynolds* was "the starting point and controlling criterion" in redistricting, we also stressed the importance of other provisions in the 1874 Pennsylvania Constitution:

It is our view that Section 16, when construed as a whole, demands that Senate apportionment legislation respect county lines and lines of other political subdivisions (such as wards, boroughs, and townships), insofar as possible, without doing violence to the population principle enunciated by

the first sentence of Section 16 and also by the Fourteenth Amendment to the Federal Constitution.... The requirement [in Section 17, respecting the House] that apportionment should be among the several counties further signifies an intention to respect county lines and to utilize counties as units of representation to the maximum extent consistent with the equal-population principle. Indeed, Section 17, when considered as a whole, demands that the boundaries of all political subdivisions be respected when not in conflict with the overriding population principle.

*Id.* at 570–71.

Time constraints precluded the *Butcher I* Court from fashioning any remedy with regard to the 1964 plan. The *Butcher I* Court's solution was to direct that the 1964 elections proceed under the infirm legislation, retain jurisdiction, and direct the General Assembly to correct course and devise a constitutionally valid plan for the 1966 election cycle no later than September 1, 1965. *Id.* at 573. The General Assembly failed to enact a plan, and so this Court found itself obliged to reapportion the Commonwealth on its own. We did so by a 4–3 vote in *Butcher II*, in 1966. *See* 420 Pa. 305, 216 A.2d 457 (*per curiam*). In explaining the plan, the *per curiam* opinion in *Butcher II* reiterated the balancing of multiple mandates required in redistricting: "Our primary concern has been to provide for substantial equality of population among legislative districts. At the same time, we have sought to maintain the integrity of political subdivisions and to create compact districts of contiguous territory, insofar as these goals could be realized...." *Id.* at 459. Justice Roberts, the author of *Butcher I*, wrote in partial dissent, objecting to the House plan on federal constitutional grounds, *i.e.*, "based primarily on its failure to observe the equal population principle and other guidelines mandated by the controlling decisions of the [U.S.] Supreme Court ... and set forth in our earlier opinion in this case." *Id.* at 474 (Roberts, J., dissenting in part).

Perhaps the most significant byproduct of the *Butcher* decisions is that they led to the Court's experiencing firsthand the difficulties of reapportionment, and particularly in a legal

landscape requiring adjustment to account for newly-developing federal law.

Following the difficulties manifested in the *Butcher* cases, and the significant developments taking place in the U.S. Supreme Court, the question of reapportionment emerged as a main issue in Pennsylvania's 1968 Constitutional Convention; the constitutional provisions on reapportionment were significantly revised; and the new Constitution, with these and other changes, was approved by Pennsylvania voters. Among the innovations of the 1968 Constitution respecting redistricting was a determination to remove the responsibility from the General Assembly as a whole, and to repose the authority in the LRC. An entirely new Section 17 of Article II was adopted to describe the composition, function, and review procedures respecting the LRC. In addition, new Section 16 constitutionalized the equal protection language from *Reynolds v. Sims*, requiring that both Senate and House districts be "as nearly equal in population as practicable." And finally, Section 16 was amended to provide, as to both chambers of the General Assembly, that, "unless absolutely necessary," no political subdivision was to be divided in forming a district, and the section made clear that the mandates of compactness and contiguity applied to both chambers.

In this Court's first redistricting decision after the adoption of the new constitutional scheme, we described the new Commission as follows:

The advantages of assignment [of] the responsibility for reapportioning the Legislature to such a commission are quite obvious, and several other states have recently adopted or considered proposals for similar commissions. The equal representation on the Commission provided to the majority and minority members of each house precludes the reapportionment process from being unfairly dominated by the party in power at the moment of apportionment. In addition, the provision for a chairman who can act as a 'tiebreaker' eliminates the possibility of a legislative deadlock on reapportionment such as the one that occurred in the Legislature of this Commonwealth in 1965 and com-

pelled this Court to undertake the task of reapportionment. At the same time the Legislature's expertise in reapportionment matters is essentially retained.

*Specter*, 293 A.2d at 17–18 (footnotes omitted).

As to the other provisions under the new scheme, the guiding principles respecting compactness, contiguity, and respect for the integrity of political subdivisions not only have deep roots in Pennsylvania constitutional law, but, as noted in our discussion of federal law, also have been specifically recognized by the federal courts, beginning with *Reynolds,* as legitimate interests that may properly be considered in redistricting state legislatures, even as against federal equal protection challenges. Moreover, the commands represent important principles of representative government. As one of the *pro se* appellants herein has noted: "The requirements of contiguous and compact districts go beyond geographical concern and also embrace the concepts of homogeneity of the district in order to facilitate the functioning of a representative form of government." Baylor Brief at 9. Baylor goes on to note the central and historical role of counties in Pennsylvania as building blocks that are not to be fractured. *Id.* at 11–12.

It is true, of course, that redistricting has an inevitably legislative, and therefore an inevitably political, element; but, the constitutional commands and restrictions on the process exist precisely as a brake on the most overt of potential excesses and abuse. Moreover, the restrictions recognize that communities indeed have shared interests for which they can more effectively advocate when they can act as a united body and when they have representatives who are responsive to those interests. In an article concerning racial issues presented in redistricting cases, Dean Gormley has explained the importance of the restrictions, as follows:

> The fundamental districting principles that the [U.S. Supreme] Court has deemed legitimate over the years include, but are not limited to, "compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests. . . ." The final principle mentioned is particularly important in the voting rights context. Historical-

ly, reapportionment bodies have considered "communities of interest" as one legitimate factor in drawing fair and politically sensitive districts. A redistricting body need not draw rigid squares of equal population; in fact, few states do so. Rather, redistricting bodies traditionally take into account a host of intangible communities, seeking to give them, where practicable, a voice in the government without unduly fracturing that voice. Thus, school districts, religious communities, ethnic communities, geographic communities which share common bonds due to locations of rivers, mountains and highways, and a host of other "communities of interest" are routinely considered by districting bodies in order to construct fair and effective maps. Shared racial background, along with political affiliation, ethnic identity, religious affiliation, occupational background, all can converge to create bona fide communities of interest, to the extent that the redistricting body makes an honest effort to draw lines around geographically compact groups in order to give them a voice in the governmental process.

As a practical matter, it is rare that a reapportionment body is able (or desires) to wholly capture a "community of interest" and draw lines around it, in a fashion that perfectly isolates it into a circle or square. In reality, communities of interest are elusive, imprecise entities. Reapportionment bodies and lower courts must be cautious when it comes to this concept, particularly where it serves as a basis for creating legislative districts tied to race, because it has the potential for abuse. Specifically, it can be used as a ruse to engage in improper maximization of majority-minority districts where no real communities exist. At the same time, states have historically considered a broad range of such imprecise communities of interest (many of which are naturally intertwined) in exercising their sound discretion. They do so to satisfy constituents. They do so to sweep together a host of generally identifiable interest groups that wish to be given a unified voice. This is perfectly healthy and permissible. It is an important aspect of the state's prerogative, when it comes to structuring its own form of

government. Consequently, when it comes to reapportionment bodies considering race in this permissive, discretionary fashion, the courts should scrupulously avoid meddling.

Gormley, *Racial Mind–Games and Reapportionment*, 4 U. Pa. J. Const. L 735, 779–81 (2002) (footnotes omitted).

### 3. *Reapportionment Decisions under the Current Constitutional Scheme*

The new constitutional redistricting scheme came into play two years later, after the 1970 census. Eighteen appeals were filed from the 1971 LRC's Final Plan, and this Court found the plan to be constitutional by a 4–3 vote, with Justice Roberts authoring the majority opinion, a mere six years after the Court itself had devised a reapportionment plan. *Specter*, 293 A.2d at 19. Perhaps inevitably given the newness of the federal (and now state constitutional) command for districts as nearly equal in size as practicable, the *Specter* majority focused primarily on population divergences, as measured by federal law.[29] We began by noting that the additional objectives for reapportionment plans in new Article II, Section 16 (beyond population equality) "were specifically recognized," by *Reynolds*, as "legitimate considerations which can justify some divergence from a strict population standard." *Id.* at 18.

Nevertheless, *Specter* emphasized that *Reynolds* still counseled that, in any reapportionment scheme, "the overriding objective must be substantial equality of population." *Id.* (quoting *Reynolds*, 377 U.S. at 579, 84 S.Ct. 1362). Given that fact, we noted that "it is not constitutionally permissible to **totally** achieve Section 16's objective of respecting the boundaries of political subdivisions." *Id.* (emphasis added). Turn-

---

**29.** Although the *Specter* Court noted that eighteen appeals were filed, it never identified the issues raised by the appellants, nor did it engage in a point-by-point discussion of the issues. Rather, the Court addressed the plan as a whole, addressing the federal equal population issue first and at length, and then provided briefer discussions of the remaining constitutional factors of integrity of political subdivisions, contiguity, and compactness. *See also* 293 A.2d at 27 n. 7 (Pomeroy, J., dissenting, joined by Jones, C.J.) ("The majority opinion, it will be noted, speaks only in general terms, making no attempt to address itself to the particular exceptions and arguments of the various appellants.").

ing to the separate concern of compactness, we noted that "Section 16's desire for districts that are 'compact' must also yield, **if need be,** to the 'overriding objective ... [of] substantial equality of population.'" *Id.* at 19 (quoting *Reynolds,* 377 U.S. at 579, 84 S.Ct. 1362) (emphasis added). The Court viewed the balancing approach required, under the new constitutional provisions, to be the same as the balancing the Court itself had outlined in explaining the redistricting undertaken in *Butcher II.*

Turning to the plan under review, the *Specter* Court noted that, since our decision in *Butcher II,* the U.S. Supreme Court had issued additional decisions striking down reapportionment plans in two cases involving congressional redistricting. *See Kirkpatrick v. Preisler,* 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969) and *Wells v. Rockefeller,* 394 U.S. 542, 89 S.Ct. 1239, 22 L.Ed.2d 519 (1969). In those cases, the High Court had found that the states' expressed desire to avoid fragmenting political subdivisions did not justify departures from the population equality requirement. The *Specter* Court recognized that the new decisions did not involve state legislative reapportionment. We also recognized that *"Kirkpatrick*'s rejection, in Congressional redistricting, of the maintenance of the boundaries of political subdivisions as a justification for deviations from absolute population equality, cannot be applied in full force to state legislative reapportionment." *Specter,* 293 A.2d at 20. Nevertheless, we viewed the decisions as "indicat[ing]" that "deviations from equality of population that were formerly regarded as insubstantial and permissible will now be regarded as substantial and impermissible, necessitating a closer adherence to equity of population, even in the area of state legislative apportionment." *Id.* Our analysis in this regard reflects that, no matter how static the governing constitutional language is, the federal decisional law that must be accounted for is fluid and dynamic.

Ultimately, the *Specter* Court upheld the 1971 Final Plan, noting, among other things, that: "No decision of the United States Supreme Court or of this Court has ever invalidated a reapportionment plan with population deviations as minimal as

those occasioned by the Commission's plan, and we believe
that the deviations clearly do not dilute the equal-population
principle 'in any significant way.' We conclude therefore that
the Commission's plan fully achieves the constitutionally-man-
dated overriding objective of substantial equality of popula-
tion." *Id.* at 22. We also concluded that the Plan maintained
sufficient integrity of political subdivisions. We emphasized
that "under any scheme of reapportionment that aims at
substantial equality of population, a certain amount of subdivi-
sion fragmentation is inevitable." *Id.* at 23. We then rea-
soned that, "[w]hile it is true that the Commission's plan
provides for more political subdivision splits than did this
Court's reapportionment plan of 1966, this increase was obvi-
ously necessitated by the stricter requirements of population
equality that are now in order. Yet despite these stricter
population requirements, the number of subdivision splits
called for by the Commission's plan is still quite small when
compared to the 2,566 municipalities and 9,576 voting pre-
cincts in this Commonwealth." *Id.* at 22–23 (footnotes omit-
ted).

Finally, the *Specter* Court concluded that the 1971 Final
Plan also met the constitutional elements of compactness and
contiguity. *Id.* at 23–24. On the question of compactness, we
emphasized that:

> [N]one of the appellants in this matter offered any concrete
> or objective data indicating that the districts established by
> the Commission's plan lack compactness. The Pennsylvania
> Constitution requires that those who challenge the Commis-
> sion's plan have the burden of establishing that it is "con-
> trary to law." In light of appellants' failure to produce any
> objective data indicating that the districts established by the
> Commission's plan lack compactness, we cannot conclude,
> merely on the basis of appellants' unsupported assertions,
> that the Commission's plan fails for lack of compactness.

*Id.* at 24.

In 1981, this Court approved the second reapportionment
under the 1968 constitutional scheme, again by a 4–3 vote. *In
re 1981 Plan,* 442 A.2d at 663. Justice Roberts, again writing

for the majority, interpreted *Specter* as holding that "as a matter of both federal and state law, equality of population must be the controlling consideration in the apportionment of legislative seats." *Id.* at 665 (citing *Reynolds,* 377 U.S. at 577, 84 S.Ct. 1362). Like the *Specter* Court, the *In re 1981 Plan* Court began by examining population deviations, and concluded that the 1981 Final Plan passed constitutional muster: "There is no doubt that this plan, which more nearly achieves the goal of equal population than did the 1971 reapportionment plan in *Specter,* satisfies equal protection requirements." *Id.* at 666, 293 A.2d 15. Indeed, "the final plan achieves an equality of population among legislative districts closer to the constitutional ideal of 'one person, one vote' than any previous reapportionment plan in the history of the Commonwealth." *Id.*

The *In re 1981 Plan* Court then turned to the various specific challenges brought by the appellants. First, the appellants claimed that the plan went too far in pursuing the constitutional goal of "one person, one vote," and in so doing failed to satisfy the requirements of compactness and respect for the integrity of political subdivisions. Specifically, the appellants argued that district deviations from compactness and subdivision boundaries were constitutionally permissible "only if those deviations are absolutely necessary to survive federal equal protection analysis." *Id.* The Court rejected the notion that these concerns were of equal value to population equality, and stated that "**if need be,** concerns for compactness and adherence to political subdivision lines must yield to this 'overriding objective' " of " 'substantial equality of population.' " *Id.* (emphasis added).

The *In re 1981 Plan* Court next turned to the appellants' argument relying on U.S. Supreme Court cases decided since *Specter,* which had upheld greater district population deviations than in either the 1971 Final Plan or the 1981 Final Plan. From those cases, the appellants argued that federally tolerated limits of substantial equality of population should define the Pennsylvania standard as well, which would allow more room to respect other constitutional imperatives, such as compact-

ness and subdivision integrity. We rejected the argument, noting that it: "disregards the critical fact that adherence to a percentage deviation that is at the outside limits of constitutionality cannot be squared with the overriding constitutional objective of 'substantial equality of population' among districts. The Pennsylvania Constitution plainly states that districts shall be 'as nearly equal in population as practicable.' Thus, the clear constitutional directive is that reapportionment shall strive to create districts as equal, not as unequal, as possible." *Id.* at 667, 293 A.2d 15. Moreover, we noted, there is no "predetermined percentage deviation from the ideal of 'one person, one vote' that satisfies the federal constitutional requirement of 'substantial equality of population.' " *Id.*

Similarly, we rejected the theory that we should review the 1981 Final Plan and determine whether there was a standard of population deviation greater than that adopted by the Commission, but less than the maximum deviation permitted under federal law, "which would more closely achieve the goals of compactness and undivided political subdivisions." We noted that our task was "not to substitute a more 'preferable' plan for that of the Commission, but only to assure that constitutional requirements have been met." *Id.* (citation omitted).

Turning to the particulars of the 1981 Plan, the Court began by stressing federal authority that, " 'in determining whether a good faith effort to establish districts substantially equal in population has been made, a court must necessarily consider a State's legislative apportionment scheme as a whole.' " *Id.* at 668, 293 A.2d 15 (quoting *Lucas,* 377 U.S. at 735 n. 27, 84 S.Ct. 1459). We then concluded that the 1981 Plan "reflects a constitutionally permissible judgment on the part of the Commission that the deviations from mathematical compactness and political subdivision boundaries contained in the plan are necessary to achieve the overriding constitutional goal of districts 'as equal in population as practicable.' " *Id.* We elaborated by noting the inevitability that certain counties and municipalities would have to be split; the relatively small number of subdivision splits; and that none of the arguments

by the appellants convinced the Court that the drawing of district lines was based on impermissible considerations. Disapproving of specific, localized challenges, the Court noted that "[m]ere dissatisfaction with the fact that certain political subdivisions have been divided or have been included within particular legislative districts is not sufficient to invalidate the Final Reapportionment Plan as unconstitutional." *Id.*

By the time of this Court's third reapportionment review, in 1992, our focus on population equality diminished somewhat, perhaps because of our decisional law establishing the primacy of the principle, and perhaps also because of advances in useful computer technology. In his account of the 1991 reapportionment, Dean Gormley recounts that:

> The gradual preeminence of the one-person-one-vote principle in the 1971 and 1981 reapportionments would be turned on its head in the reapportionment of 1991. By this time, computers and high technology would make equality in population a simple exercise, while new frontiers, particularly the Federal Voting Rights Act of 1965 [42 U.S.C. §§ 1971–1974E) ] (as it had been amended in 1982), would loom up with historic prominence and threaten to topple reapportionment plans in Pennsylvania and across the nation."

Gormley, Legislative Reapportionment, at 18. Gormley recounts that, cognizant of the "super-emphasis" on population equality, the 1991 LRC was armed with tools that could achieve increasingly "ideal" districts, but still sought to remain flexible when faced with additional reapportionment factors, such as those set forth in Section 16, and the belief in the propriety of attempting to achieve political "fairness" by maintaining, to a practicable degree, the parties' existing balance of power. *Id.* at 26–27, 45–47.

In a decision resolving twenty-five appeals, this Court upheld the 1991 Final Plan, without dissent, in an opinion by Mr. Chief Justice Nix. *In re 1991 Plan*, 609 A.2d at 147. The Court spent little time dismissing challenges, similar to those raised ten years before, that the imperative of population equality "is not so important that it warrants the division of

counties and other political subdivisions." *Id.* at 138. As in 1981, this argument was premised upon decisions of the U.S. Supreme Court, rendered after *Reynolds,* which had upheld state reapportionment plans with, by this point in time, variances of up to 16%. *Id.* at 138–39 & n. 6 (citing, *inter alia, Brown v. Thomson,* 462 U.S. 835, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983) (plan with average deviation of 16%)). From that federal authority, the appellants argued that "these cases bind this Court to require greater population variances to protect the sanctity of political subdivision borders." *Id.* at 138. We disagreed:

> Appellants are incorrect. The Supreme Court of the United States held [in *Reynolds* ] that "some deviations from the equal population principle *are constitutionally permissible* with respect to the reapportionment of seats in a state legislature." This language merely allows a state to apportion seats between districts that are not strictly equal in population; it does not mandate it. Our Constitution requires that the overriding objective of reapportionment is equality of population, and in 1972 and 1981 this Court approved plans in which the overriding objective was equality of population. We see no reason now in 1992 to retreat from those earlier holdings.

609 A.2d at 138–39 (citation omitted and italics in original).[30]

As the text of Article II, Section 16, and our review of our prior reapportionment cases above makes clear, the *In re 1991 Plan* Court's statement that "Our Constitution requires that the overriding objective of reapportionment is equality of population," is not correct as a textual matter. That "overriding objective," as articulated in our 1972 and 1981 decisions, derived from this Court's interpretation of federal law, and in particular *Reynolds,* and our effective treatment of that law as coterminous with Pennsylvania's population equality requirement. However, the *In re 1991 Plan* Court certainly was correct that our two prior decisions had established the prima-

---

**30.** The remainder of the challenges reviewed in *In re 1991 Plan* involved issues not pertinent here; the major challenges involved the Voting Rights Act.

cy of equality of population, in large part in an effort to ensure that Pennsylvania plans complied with federal law.

In 2002, this Court, in a unanimous decision by Mr. Chief Justice Zappala, approved the 2001 Final Plan, based upon the 2000 census, in the face of eleven appeals. *Albert,* 790 A.2d at 991. After surveying our prior reapportionment decisions, we noted that our review focused on an examination of "the final plan as a whole," and we reiterated the teaching from *In re 1981 Plan* that, " 'to prevail in their challenge to the final reapportionment plan, appellants have the burden of establishing not .... that there exists an alternative plan which is 'preferable' or 'better,' but rather that the final plan filed by the Pennsylvania Reapportionment Commission fails to meet constitutional requirements.' " 790 A.2d at 995 (quoting from *In re 1981 Plan,* 442 A.2d at 665).

Turning to the specific claims raised, the *Albert* Court noted that the challengers asserted that the new districts were "not composed of compact and contiguous territory as nearly equal in population as practicable because, in creating the plan, political subdivisions were divided where it was not absolutely necessary." 790 A.2d at 995. We further noted, however, that the challengers had focused "primarily on the impact of the plan with respect to their particular political subdivision, rather than analyzing the plan as a whole, as is required under a proper constitutional analysis. This will become apparent as the individual petitions are addressed." *Id.* The Court then reviewed in some detail the specific, localized complaints of the various appeals, which cited to specific subdivisions and districts and forwarded various complaints including compactness, contiguity and unnecessary subdivisions. After briefly summarizing the 2001 LRC's response, we again emphasized that the focus had to be on the plan as a whole and not on individual districts: "The Commission persuasively argues that none of the appellants ha[s] met the heavy burden of establishing that the final plan, as a whole, is contrary to law." *Id.* at 996–98.

More specifically, the *Albert* opinion credited the 2001 LRC's argument that various claims failed as conclusory or

vague; and that the 2001 Final Plan "compares favorably" to prior plans the Court had approved in terms of population deviation. *Id.* at 998. Respecting the various complaints about particular districts being split unnecessarily, the Court also credited the 2001 LRC's averments that: the overriding objective was equality of population; other factors causing subdivision splits resulted from Voting Rights Act requirements and population shifts; the 2001 Plan compared "favorably" to prior plans "found to be constitutional by this Court"; and the number of political subdivisions split remained relatively small. *Id.* at 999. Finally, we rejected individual pleas premised upon particular subdivision splits, as follows: "The appellants urge us to consider the 'homogeneity' and 'shared interests' of a community as guidelines. We believe that these concepts are too elastic and amorphous, however, to serve as a judicial standard for assessing the reapportionment process. As the appellants' arguments indicate, these concepts often reflect nothing more than continuation of the pre-existing legislative districts. Should community interests be fostered merely by residing in the same district, we have no reason to believe that the current reapportionment of the legislative districts will not achieve this result with the passage of time." *Id.*

In a joining concurrence, Mr. Justice Saylor, joined by Mr. Justice Eakin and this author, although agreeing that the 2001 Plan was consistent with our prior precedent, nevertheless expressed the following concern:

I remain circumspect concerning the manner in which state constitutional requirements of compactness and integrity of political subdivisions have been applied by the Court in the prior decisions that are followed here, and I am receptive to the concern that the Court should not occupy an unduly passive role in the vindication of these essential precepts. I write, therefore, to express my own position that facets of the Commission's present plan for reapportioning the Pennsylvania Legislature test the outer limits of justifiable deference, at least in the absence of some specific explanation for why the constitutional prerequisites of compactness and

respect for political subdivisions cannot be accommodated simultaneous with the maintenance of substantial equality of population and enforcement of voting interests of protected groups in the manner prescribed by federal law.

*Id.* at 1000 (Saylor, J., concurring).

## VI. The Global Challenges: Holt and Costa
—A—

Our holding that the global challengers have proven that the 2011 Final Plan is contrary to law follows almost inexorably from the global nature of their challenge—global in the sense that it challenges the entire 2011 Final Plan—and our holdings above concerning the scope and standard of review. This is so because the LRC has premised its central defense against these global challenges upon its position on the judicial review points. As noted, our last redistricting decision, in *Albert*, rejected a number of appeals posing various localized challenges to the 2001 Final Plan, and emphasized, consistently with our prior decisions, that a successful appellant must challenge a final plan as a whole. *Albert*, 790 A.2d at 995–96; *accord In re 1981 Plan*, 442 A.2d at 667–68. No challenger did so in *Albert*, and insofar as our prior Opinions in this area reflect, no challenger did so in the redistricting litigation in 1972, 1981, or 1992, either.

The LRC drew one lesson from *Albert*, while the *Holt* and *Costa* appellants drew a very different lesson. The LRC emphasized in its brief and at oral argument that, in developing the 2011 Final Plan, it heeded and attended to the concurrence's concerns, thus addressing complaints (ultimately unsuccessful in *Albert*) arising from the more objectionable aspects of the 2001 Plan. (The specifics of this point are unimportant; the point is not disputed.) The LRC also emphasized that, as to certain (but not all) other particulars (population deviation and the numbers of political subdivisions unaffected by splits), its Plan compared favorably to prior plans. We do not doubt the accuracy of the LRC's account of its endeavor, motivation, and results in this regard; nor do we doubt that its actions would suffice if faced with the same

sorts of localized challenges that were pursued unsuccessfully in 2002, respecting compactness, contiguity, and curious subdivision splits.

The appellants in *Holt* and *Costa*, however, recognizing that prior redistricting challenges failed precisely because they were localized and piecemeal, attended to the *Albert* Court's central rationale and holding, and its implicit warning to the next LRC, that different considerations, and results, might obtain if a Final Plan were to be challenged as a whole. No doubt assisted by advances in computer technology that certainly would not have been available to redistricting challengers in 1972 and 1981, the *Holt* and *Costa* appellants offered challenges to the 2011 Final Plan **as a whole,** proffering alternative plans not in the hope of having them accepted as "better than" or "preferable to" the Final Plan, but as evidence that the Final Plan was contrary to law. By this proffer, appellants attempted to show that the same basic considerations that the LRC says powered and justified its decisions to split political subdivisions could easily be accommodated with far less violence to the integrity of political subdivisions, and to a lesser extent, to the command of compactness.

In the past, this Court has dismissed redistricting objections which failed to offer "any concrete or objective data" and relied instead on "conclusory" allegations and dictionary definitions to support claims of constitutional violations. *Specter,* 293 A.2d at 24. The *Holt* and *Costa* appellants have not made this error; they have produced, and they submitted to the LRC, detailed plans deriving from concrete data, data also used by the LRC, to support their assertions that the pervasive political subdivision splits in the Final Plan were not "absolutely necessary." Notably, the particulars of these alternative plans have not been materially contested by the LRC.[31]

---

31. We view the alternative, global plans as comprising the sort of concrete and objective data envisioned in *Specter.* The LRC argues that alternative plans should not be considered evidence by this Court because their general accuracy is questionable, given that the challeng-

■ For purposes of explication, in examining whether the 2011 Final Plan is contrary to law, we will focus primarily on the evidence represented by Holt's alternative plan.[32] This plan shows that a redistricting map could readily be fashioned which maintained a roughly equivalent level of population deviation—the LRC's primary justification for the numerosity of the political subdivisions it divided—as the Final Plan, while employing significantly fewer political subdivision splits with respect to both Chambers of the General Assembly. The *Holt* appellants also highlighted that their alternative plan had deviations from the ideal population for both the House and Senate districts that were smaller than the deviations in the Final Plan. Although appellants' brief goes into great detail

ers do not benefit from the extensive and knowledgeable technical, administrative, and institutional capabilities which safeguard the LRC's process. *See* LRC Brief at 31–32. In addition, the LRC provides two examples in which counties are either not accounted for or are double-counted in the *Holt* alternative plan. At argument, however, counsel for the *Holt* appellants explained that the inaccuracies of which the LRC complained were clerical errors in transcription from the original document composed by Ms. Holt, which in fact accounted for all subdivisions; and noted similar errors in the LRC's legal description of the Final Plan. *See* Transcript of Oral Argument, 1/23/12, at 20–21. The LRC did not dispute the explanation.

Respecting the LRC's legal argument, we note that the LRC did not dispute the factual allegations in the *Holt* petition for review, or allege fraud, impropriety, or material inaccuracy in its response to the petition. We also note that, given its access to the relevant data and its expertise, the LRC is certainly capable of ascertaining and formulating fact-specific claims as to individual plans, and could have done so here. And, finally, we view this argument—that only the LRC's Plan can be reliable—as a variation of its claim that alternatives simply cannot be considered. Respectfully, we do not believe that Article II, Section 16 intends to set such an impossible bar for citizen challengers.

32. The *Holt* appellants presented an alternative plan to the LRC on November 18, 2011, which was then amended twice; all three plans were attached to the *Holt* Petition for Review as exhibits. In their brief, the *Holt* appellants focus on the latest amended plan, to which we will confine our discussion.

The *Costa* appellants also offered their alternative plan after the LRC issued its preliminary plan. At oral argument, counsel for *Costa* explained that the *Costa* plan did not seek to achieve the minimum number of necessary divisions, but instead to show that the number of split municipalities could be reduced compared with the LRC's preliminary plan, even while maintaining similar electoral performance.

comparing their plan to the Final Plan, the most convincing point is the raw number difference in subdivision splits. **In the House,** the alternative plan splits seven fewer counties, 81 fewer municipalities, and 184 fewer wards; **in the Senate:** the *Holt* plan splits seven fewer counties, two fewer municipalities, and 22 fewer wards. In addition, with regard to political subdivisions which were split at least once, the *Holt* plan created: **in the House:** 39 fewer county fractures, 186 fewer municipality fractures, and 228 fewer ward fractures; and **in the Senate:** 37 fewer county fractures, six fewer municipality fractures, and 50 fewer ward fractures, than the Final Plan. In total, for the House, 184 fewer subdivisions were divided, and 453 fewer fractures were established; in the Senate, 31 fewer subdivisions were split, and 93 fewer divisions were established. *Holt* Brief at 17. The LRC does not dispute the accuracy of this accounting.[33] The *Holt* appellants also offered specific examples of political subdivisions with populations smaller than the ideal House or Senate district which were maintained intact in the alternative plan while maintaining appropriate levels of population deviation.

The *Holt* appellants argue that the Final Plan is contrary to law because, as their alternate plan proves, while the Final Plan may comply with governing law respecting population equality, the Plan flouted independent and coexisting Pennsylvania constitutional mandates of compactness and contiguity of legislative districts, and respect for political subdivision boundaries.[34] Appellants claim that, if the LRC had prepared a plan

**33.** We have intentionally avoided listing the specific number of divisions in the alternative plans because our decision does not purport to convey in absolute terms what is an acceptable number of political subdivision splits.

**34.** In the alternative, appellants claim that the LRC should have provided a "specific explanation" for why the constitutional mandates could not be accommodated. *Holt* Brief at 24 (citing *Albert,* 790 A.2d at 1000 (Saylor, J., concurring)). As our mandate reflects, we view appellants' argument as already having established that the Final Plan was contrary to law. The LRC has had a full opportunity to offer neutral explanations of what were proven to be vast numbers of unnecessary splits of political subdivisions, and failed to do so. We see no point in a remand for a specific explanation, in addition to the ones proffered, under these circumstances.

in strict compliance with Section 16, including the requirement respecting population equality, a significant number of political subdivision splits would not have occurred, because they could not have been "absolutely necessary." The alternative plan, appellants assert, proves that compliance with the constitutional requirements of population equality, compactness, and contiguity does not and cannot justify the extent of the division of counties, municipalities, and wards in the Final Plan. Accordingly, appellants suggest that remand is appropriate for the LRC to "make 'a second attempt at reapportionment' that complies with the plain language of Section 16 of Article [II] of the Pennsylvania Constitution." *See Holt* Brief at 16–20.[35]

The *Holt* plan is powerful evidence indeed. The LRC answers that appellants failed to carry their burden of proof. We cannot agree.

The LRC primarily argues that alternative plans cannot be considered because they are outside this Court's scope of review or, alternatively, that the particular plans proffered as evidence are insufficient to prove that the Final Plan is contrary to law. The LRC's position rests upon assumptions about the scope and standard of review which we have reject-

---

**35.** The *Costa* appellants add only that the constitutional mandate to respect political subdivision boundaries in the redistricting process is unambiguous and should not be read out of Section 16. The language "unless absolutely necessary," according to these appellants, should be read as a command that the LRC "must avoid the splits of governmental units, if at all possible." *Costa* Brief at 29. In all other respects, the *Costa* arguments are similar to those of the *Holt* appellants. According to the *Costa* appellants: "[u]nlike in past reapportionment challenges, the statewide statistical data that Senator Costa presented provides conclusive evidence that it was not 'absolutely necessary' for the [LRC] to divide multiple subdivisions. That data is reflected in the [a]lternative [p]lan, which, in all relevant respects, is similar to the Final Plan except for its reduction in the number of divisions of political subdivisions." *Id.* at 32–33. The *Costa* appellants request remand and suggest that their alternative plan should serve as the starting point for the LRC in its second attempt at redistricting. *Id.* at 34, 293 A.2d 15.

We will not direct that the LRC begin its task on remand with the *Costa* plan, the *Holt* plan, or any particular plan. We trust that the LRC will heed to the guidance in this Opinion with alacrity and fashion a plan giving full respect to the multiple commands in Article II, Section 16.

ed in Part IV of this Opinion. For example, we have rejected the LRC's claim, premised upon a misapprehension of our precedent, that alternative plans offered as evidence that a Final Plan is contrary to law are "irrelevant." We recognize that our prior decisions have made clear that the LRC is not obliged to accept an alternative plan merely because it appears to be, or is offered as, "better" than or "preferable" to the LRC's Plan. *See In re 1981 Plan*, 442 A.2d at 667; *see also* Part IV, *supra*. But, that is a very different point. These appellants do not ·claim that the LRC was obliged to accept their plans; they just offer those plans as proof that the LRC's Final Plan contained subdivision splits that were not absolutely necessary.

The LRC also levels an individual criticism at the *Holt* plan, complaining that, although this alternative achieves greater population parity overall, in some specific districts, the population equality deviation is greater than under the Final Plan.[36] Thus, the LRC requests that the Court dismiss these appeals because the 2011 Final Plan is superior to the 2001 Final Plan in terms of population equality deviation and the number of political subdivision splits.[37]

To take the LRC's latter point first, in our discussion of the standard of review, we have already addressed the notion that this Court's "approval" of prior plans, as against certain discrete challenges, acts to pre-approve aspects of future

**36.** The LRC also criticizes specifics of the *Costa* plan, on grounds that it achieves fewer political subdivision splits at the cost of increasing the population deviation to a level higher than the Final Plan, and higher than any other plan since 1971. Furthermore, the LRC reviews each political subdivision fracture in the Final Plan of which the *Costa* appellants complain, and claims that each was either necessitated by the "overriding" population equality mandate or had been split in the 2001 Final Plan and, therefore, was "approved" by this Court in *Albert*. We answer the latter point, respecting supposed prior "approvals," in text. Respecting the population deviation point, since our analysis above turns on *Holt*, we will confine our response to the LRC's criticism of that plan.

**37.** As a subsidiary point, the LRC argues that only the number of split subdivisions, and not the total number of fractures, is relevant to our constitutional inquiry. We find no support in our prior decisions, and the LRC offers no developed or cogent argument, favoring this premise.

plans, as against distinct, different challenges. Again, we do not doubt that this Final Plan is an improvement over the 2001 Final Plan. And, for all this Court knows, perhaps the 2001 Plan was the best that the technology then available could devise, respecting "absolutely necessary" splits. But, the 2001 Plan was not challenged as a whole, and like every other plan since 1971, it was not challenged with compelling, objective, concrete proof that a large number of political subdivision splits were not "absolutely necessary."

Turning to the LRC's complaint that the *Holt* plan increases population deviation in some specific districts, even though it achieves greater population parity overall, we fail to see how this diminishes the power of the *Holt* plan as proof that the Final Plan was contrary to law. Our prior cases concerning population deviations have looked to overall ranges; indeed, the *Holt* plan, in this regard, seems to comport better with the LRC's primary focus upon population equality.

More fundamentally, we recognize that this Court's prior decisions emphasized equality of population as the primary directive in the redistricting efforts of the LRC. That mandate is unique because it is dually commanded by our charter and the federal Equal Protection Clause—an independent force, with contours that may change with each new relevant decision from the U.S. Supreme Court. Our prior decisions have gone so far as to recognize that, "if need be," the concerns for compactness and adherence to political subdivision lines must yield to the "overriding objective" of "substantial equality of population." *See In re 1981 Plan,* 442 A.2d at 666; *Specter,* 293 A.2d at 18–19 (quoting *Reynolds,* 377 U.S. at 579, 84 S.Ct. 1362). We have also stated that "if necessary, any political subdivision or subdivisions may be divided or combined in the formation of districts where the population principle cannot otherwise be satisfied." *Specter,* 293 A.2d at 25 (quoting *Butcher I,* 203 A.2d at 570–571). But, all of this Court's cases, going back to *Butcher I,* have specifically recognized that population equality is not the only command in redistricting. Every one of the cases has an important qualifier, such as "if need be," "if necessary," if the population principle "cannot

otherwise" be satisfied. We have always recognized the independent vitality of the requirements of contiguity, compactness, and the integrity of political subdivisions. Moreover, none of the cases identify a population variation that must be achieved in redistricting; just as we did not require the LRC to expand population deviation to the outer limits that might be approved under federal law, *In re 1981 Plan*, 442 A.2d at 667, we also did not say that compression of population equality to the narrowest point of difference is required, at the expense of absolute, constitutional commands of compactness, contiguity and integrity of political subdivisions. The "practicable" modifier in the "as nearly equal in population as practicable" language necessarily leaves room for the operation of the other constitutional commands.

The *Holt* alternative plan avoided a highly significant percentage of political subdivision splits and fractures while maintaining a lower average population deviation from the ideal than the Final Plan. A concrete showing has been made that political subdivisions were split, even where the population was smaller than the ideal legislative district and a division was avoidable; and that the number of fractures across the Commonwealth was considerably higher in the Final Plan than the *Holt* plan proved was easily achievable. This powerful evidence, challenging the Final Plan as a whole, suffices to show that the Final Plan is contrary to law. While the LRC was not, and is not, obliged to adopt any of the alternate plans presented to it, it must devise a new plan upon remand.

Much focus, in the briefs, and at argument, has been placed on the level of proof required to show that a Final Plan is contrary to law, the fear being that "someone can always come up with a better plan." We need not determine a minimum level of proof, deriving from such an "alternate" plan (or other concrete source), that would be "enough" to show that a Final Plan made excessive political subdivision splits without absolute necessity. We realize that the task is not so simple as the production of a plan with "better" numbers; thus, we reject the invitation to set firm parameters. It is enough that the *Holt* plan here overwhelmingly shows that the 2011 Final Plan

made subdivision splits that were not absolutely necessary, and certainly could not be justified on the population equality or other grounds proffered. Indeed, the proof is strong enough that we view it as inconceivable, to borrow from one of the U.S. Supreme Court's equal protection decisions, that the magnitude of the subdivision splits here was unavoidable. *See Kirkpatrick*, 394 U.S. at 532, 89 S.Ct. 1225 ("[I]t is simply inconceivable that population disparities of the magnitude found in the Missouri plan were unavoidable.").

We likewise realize that the absence of certainty is a frustration for the LRC, a concern ably articulated by counsel. But, that is often the case when constitutional principles are at work, and particularly when competing constitutional principles apply. This is reflected in the U.S. Supreme Court's own fact-specific decisional law in the equal protection cases and the Voting Rights Act cases, all factors with which the LRC must contend. In *Reynolds*, the High Court spoke of the Equal Protection Clause requiring "that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." 377 U.S. at 577, 84 S.Ct. 1362. We trust, too, in the good faith of the LRC to fashion a plan, upon remand, that comports with all of the requirements of Article II, Section 16.

—B—

Although we are satisfied that the *Holt* appellants have carried their burden of proving that the 2011 Final Plan is contrary to law premised on the existence of a significant number of political subdivision splits that were not absolutely necessary, like the *Albert* concurrence, we have additional concerns, and particularly respecting compactness, with this Final Plan. These issues may be a product of the excessive subdivision splits, and since we are remanding the matter, we offer the following commentary.

The obvious "compactness" issues with three particular Senate districts were noted by the Court at oral argument. Senate District 3 stretches—in the shape of a wish bone—

from the far northeast section of Philadelphia down into North Philadelphia, and then up again into the Roxborough/Chestnut Hill area. Meanwhile, Senate District 35 reaches—like a crooked finger—from the southernmost border of Pennsylvania, north across two thirds of the Commonwealth, and contains all of Bedford County, all of Cambria .County, a small portion of Somerset County, then enters Clearfield County, and finally crosses over into Clinton County. Perhaps less overt, but no less facially problematic in terms of compactness, was Senate District 15, described by the Court as an "iron cross," which reaches from North to South narrowly, and then East to West narrowly, to cover a third of York County, a third of Dauphin County, and to timidly reach into corners of Adams and Lancaster Counties. *See* Transcript of Oral Argument, 1/23/12, at 43–45, 70, 83–85. In response, the LRC explained that the reach of these districts—one of which is in the most densely populated area of the Commonwealth, Philadelphia—is justified by the primacy of the population equality concern. *See, e.g., id.* at 43, 790 A.2d 989 (LRC counsel stated that Senate District 3 "is compact given the population"). We have stated with respect to the constitutional mandate of compactness that "there is a certain degree of **unavoidable** non-compactness in any apportionment scheme." *Specter*, 293 A.2d at 23. This Court did not sanction abandonment of the compactness constitutional mandate in favor of a population equality absolute.

—C—

In light of our disposition, we do not decide or address at any great length the remaining appeals, and aspects of appeals, which focus on particular effects on specific political subdivisions. It is sufficient to reiterate, for reasons already explained, that we decline the invitation to revisit prior precedent requiring a successful appellant to challenge the plan as a whole, *see* n. 18, *supra.* We also note that the particular political subdivision fractures of which individual appellants complain may well be addressed by the LRC in its new plan upon remand. Having said this, we trust that the

LRC, in formulating its new plan, and necessarily reducing the political subdivision splits and fractures, will be attentive to the concerns of historically unified subdivisions, such as County seats. In the end, however, we recognize that the Pennsylvania Constitution permits absolutely necessary political subdivision splits, and that some divisions are inevitable. We do not mandate that the LRC avoid specific divisions, and leave the LRC to conduct its discretionary task within the limits set by the Constitution, reaffirmed above, and the prospective guidance we outline below.

—D—

The Court is satisfied that the Final Plan is contrary to law and, as our discussion above has revealed, there is no need to revisit or adjust our existing precedent to reach this conclusion. Nevertheless, as we will explain in Part VII below, we believe that prospective recalibration of certain of our precedents would be salutary and helpful in this unusual area of law, where the Court is called on to rule and speak only once every decade, and usually in circumstances that make it difficult to produce the most reasoned of expressions.

## VII. Additional, Prospective Guidance for Remand

Several factors convince us that there would be some benefit in providing prospective guidance in the redistricting realm, even as to points not necessarily joined in this litigation. First, is the fact that this Court is the sole voice passing upon state law challenges to redistricting appeals, but our consideration has been limited to a single, mass appeal, once every ten years, and under severe time constraints which affect the litigants no less than the Court. Second, is the fact that each redistricting plan seems to generate similar citizen complaints concerning the alleged disrespect of political subdivisions, and the formation of odd and non-compact districts of disparate political subdivisions. Third, is the advent of computer technology. As is reflected in Dean Gormley's account of the 1991 reapportionment, and as demonstrated in practice in the alternate plans produced by the *Holt* and *Costa* appel-

lants here, this development suggests that this Court's early establishment of the primacy of equalization of population in formulating redistricting plans (a far more difficult task before technological advancements, as the Court itself experienced in the *Butcher* appeals) may warrant reconsideration—at least respecting the degree to which population equality must be pursued, or must be deferred to as an explanation for allegations of unnecessary violence to other constitutional precepts. Fourth, and finally, our own review of our governing precedent in deciding these appeals has led us to conclude that it should be recalibrated to allow the LRC more flexibility in formulating plans, and particularly with respect to population deviation. This adjustment should allow more breathing space for concerns of contiguity, compactness, and the integrity of political subdivisions to be respected. Our prior precedent sounds in constitutional law; to the extent it is erroneous or unclear, or falls in tension with intervening developments, this Court has primary responsibility to address the circumstance.[38]

Mr. Justice Saylor has twice addressed aspects of these concerns. First, in his 2002 concurrence in *Albert*, he noted that he remained "circumspect concerning the manner in which state constitutional requirements of compactness and integrity of political subdivisions have been applied by the Court in the prior decisions that are followed here." 790 A.2d at 1000. Second, in his dissenting statement to the *per curiam* order this Court entered before announcing the rea-

---

**38.** As a function of our system of government, this Court has the final word on matters of constitutional dimension in Pennsylvania. *Pap's A.M.*, 812 A.2d at 611; *Shambach v. Bickhart*, 577 Pa. 384, 845 A.2d 793, 807 (Pa.2004) (Saylor, J., concurring). Our charter, unlike statutes of the General Assembly or agency regulations, is not easily amended and any errant interpretation is not freely subject to correction by any co-equal branch of our government, other than this Court. *Shambach*, 845 A.2d at 807 (Saylor, J., concurring); *see also Payne v. Tennessee*, 501 U.S. 808, 828, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); *cf. City of Scranton v. Firefighters Local Union No. 60*, 29 A.3d 773, 784–85 (Pa.2011) (describing swift legislative action to amend State Employees' Retirement Code following Court decision). For this reason, we are not constrained to closely and blindly re-affirm constitutional interpretations of prior decisions which have proven to be unworkable or badly reasoned. *See Payne, supra.*

sons for our mandate here, Justice Saylor, joined by Mr. Justice Eakin and Madame Justice Orie Melvin, noted that he was "receptive to the concern that past decisions of the Court may suggest an unnecessarily stringent approach to equalization of population as between voting districts," but he believed "this could be addressed via prospective guidance from the Court." Order, 1/25/12 (*per curiam*) (Saylor, J., dissenting).

Since we have already announced our determination to remand, and a new plan is to be devised, this Opinion provides the first opportunity to offer prospective guidance, and we will avail ourselves of the opportunity.

 First, and most simply, we reemphasize the importance of each of the mandates in Article II, Section 16. Contrary to the suggestion of the Court in *In re 1991 Plan*, Article II, Section 16 by its terms does not "require that the overriding objective of reapportionment is equality of population." 609 A.2d at 139. Rather, the Constitution lists multiple imperatives in redistricting, which must be balanced. Moreover, as our discussion of the governing law in Part V makes plain, the other imperatives in Article II, Section 16 have all been recognized by the U.S. Supreme Court as legitimate state interests that may affect, and warrant, deviations in population equality.

Rather than deriving from the language of our Constitution itself, the primacy of population equality in redistricting, which is clearly established in our decisional law, derives from federal decisional law, and particularly *Reynolds v. Sims*. Our earliest redistricting opinions reflected an acute awareness of Pennsylvania's obligations to respect federal law—at the same time we were construing our own organic constitutional commands. Our first decisions grappling with *Reynolds*, in the *Butcher* cases and in *Specter*, occurred when this area of federal constitutional law was both new and dynamic. Indeed, it appears that it was the very dynamism of the federal decisional law that led this Court in *Specter* to emphasize the special primacy of population equality. As we have detailed in Part V above, it appears that this Court's approach was

powered by its prediction of where the U.S. Supreme Court was heading in its interpretation of *Reynolds*. Thus, the Court derived from the congressional reapportionment decisions in *Kirkpatrick* and *Wells* "that deviations from equality of population that were formerly regarded as insubstantial and permissible will now be regarded as impermissible, necessitating a closer adherence to equality of population, even in the area of state legislative reapportionment." *Specter*, 293 A.2d at 20. In upholding the plan in *Specter*, the Court noted, among other things: "It is clear that the Legislative Reapportionment Commission recognized that closer adherence to the requirement of equality of population is now constitutionally in order for state legislative reapportionment plans." *Id.* at 22.

But, of course, the business of predicting the future course of any dynamic and complicated area of decisional law is an uncertain one, and as it developed, U.S. Supreme Court precedent did not proceed in the constricting way that we predicted in *Specter*; it instead evolved to permit more flexibility in population deviation as a federal constitutional matter. Notwithstanding this development, and the fact that it was argued to this Court as a basis for permitting greater deviations of population in later redistricting cases, we did not grapple with the implications of our initial prediction, and our effective "constitutionalization" of a prediction of federal law frozen in time. Instead, we continued to suggest an inflexibility respecting population deviation that was no longer required by federal law. The necessary corollary implication was that the Court was devaluing the remaining Section 16 requirements of compactness, contiguity, and political subdivision integrity. It is not necessary to recount the claims, circumstances and results; they are detailed in our summary of the governing law in Part V.

Meanwhile, the development of computer technology appears to have substantially allayed the initial, extraordinary difficulties in achieving acceptable levels of population deviation without doing unnecessary violence to other constitutional commands. Again, the *Holt* plan proves the point.

Accordingly, we take this opportunity to reaffirm the importance of the multiple commands in Article II, Section 16, which embrace contiguity, compactness, and the integrity of political subdivisions, no less than the command to create legislative districts as nearly equal in population as "practicable." Although we recognize the difficulty in balancing, we do not view the first three constitutional requirements as being at war, or in tension, with the fourth. To be sure, federal law remains, and that overlay still requires, as *Reynolds* taught, that equality of population is the "overriding objective." But, as later cases from the High Court have made clear, that overriding objective does not require that reapportionment plans pursue the narrowest possible deviation, at the expense of other, legitimate state objectives, such as are reflected in our charter of government. *See, e.g., Gaffney*, 412 U.S. at 748–49, 93 S.Ct. 2321 ("Fair and effective representation ... does not depend solely on mathematical equality among district populations. There are other relevant factors to be taken into account and other important interests that States may legitimately be mindful of."); *Mahan*, 410 U.S. at 329, 93 S.Ct. 979 (upholding deviations from ideal population equality as justified by rational policy of maintaining integrity of political subdivisions in Virginia state legislature). The law has developed to afford considerably more flexibility.

We trust that our recalibration of the emphasis respecting population equality to afford greater flexibility in reapportioning legislative districts by population should create sufficient latitude that the 2011 LRC, and future such bodies, may avoid many of the complaints that citizens have raised over the years, particularly respecting compactness and divisions of political subdivisions. Like the U.S. Supreme Court, we do not direct a specific range for the deviation from population equality, or purport to pre-approve redistricting plans that fall within that range. Nor do we direct the LRC to develop a reapportionment plan that tests the outer limits of acceptable deviations. *See In re 1981 Plan*, 442 A.2d at 667. The law in this area remains complex and dynamic, and we stress, once again, that we deem the LRC to retain considerable discretion

in fashioning a plan that comports with all constitutional requirements. Furthermore, we have no doubt that the LRC will act in good faith, and with fidelity, in discharging its weighty, difficult constitutional duty on remand—no less than we have in discharging our appellate function.

## VIII. Procedure on Remand

Where, as here, aggrieved citizens prove that a redistricting plan is contrary to law, the Constitution specifies that the remedy is a remand to the LRC and the Final Plan does not have force of law. This Court's *per curiam* order of January 25, 2012, rendered two days after argument, provided the only direction possible to candidates in light of our Constitution and our 2002 decision in *Albert,* which upheld the 2001 Final Plan. As we have noted earlier, we recognize that our constitutional duty to remand a plan found contrary to law has disrupted the 2012 primary election landscape. That disruption was unavoidable in light of the inexcusable failure of the LRC to adopt a Final Plan promptly so as to allow the citizenry a meaningful opportunity to appeal prior to commencement of the primary season. We trust that the LRC will avert similar delay as it is called upon to faithfully execute its task upon remand, and we trust that future such Commissions will act more promptly.

We are not in a position to predict when the LRC will complete its task of developing a new final redistricting plan that complies with law, nor when such a new plan can become final and have force of law.[39] Any issues respecting deferring the state legislative primary, or scheduling special elections, *etc.,* are, in the first instance, the concern and province of the political branches. Such questions have not been briefed and presented to this Court.[40]

Jurisdiction retained.

**39.** The *Costa* appellants have suggested that, with the use of available computer technology and familiarity with the necessary data, a new preliminary plan accounting for the objective criteria set forth in our Constitution can be generated in a matter of days. *Costa* Brief at 34.

**40.** We note that once the LRC approves a new preliminary plan, the Constitution affords persons aggrieved by the new plan a right to

Justices BAER, TODD, and McCAFFERY join the opinion.

Justice SAYLOR files a concurring and dissenting opinion.

Justice EAKIN files a concurring and dissenting opinion.

Justice ORIE MELVIN files a dissenting opinion.

Justice SAYLOR, concurring and dissenting.

The majority opinion is remarkable in many aspects, including its timeliness, its scope, and the passages of salutary guidance which it provides. For the most part, I support the clarification of the appellate review for redistricting challenges, particularly in terms of: the acceptance that alternate plans may be employed by challengers to address their heavy burden of proof; the movement toward a more circumspect position regarding the role of population equality; and the recognition of the interplay among the several requirements of the Pennsylvania Constitution pertaining to redistricting. My thoughts, however, do not align with the majority's criticisms of the Legislative Reapportionment Commission, inasmuch as I have limited perspective concerning the difficulties encountered by the Commission in crafting a redistricting plan.

In light of the inevitability of dividing some political subdivisions in the redistricting exercise, the appellate review of plan challenges preeminently represents an exercise in line drawing. I use this term figuratively, of course, since the Court is not generally in a position to draw the boundaries on a map, but it does determine the degree of latitude to be accorded to a legislative reapportionment commission in arranging voting district boundaries. The allocation of the burdens and the affordance of deference in the judicial review reflect the complex nature of a commission's task and the constraints inherent in its oversight. Indeed, I had no illusions in 2002 that, had the then-existing legislative reapportionment commission narrowed or otherwise altered the range of consider-

object, before the plan is finally approved by the LRC, and to a subsequent right to appeal to this Court. Should such appeals be filed, we will decide them with alacrity, as we have decided the ones now before us.

ations taken into account in fashioning voting-district boundaries, there could not have been fewer divisions. Moreover, with regard to the 2011 Final Plan, I agree with the majority that it is an improvement over the 2001 plan, *see* Majority Opinion, at 435–437, 37 A.3d at 755–56, which surmounted the challenges raised in the appeals before this Court.

While the majority correctly observes that those challenges were narrower in scope than the lead ones presented here, consideration of the overall plan was encompassed in my own review. The concerns which I set forth in the *Albert* decision were premised on such consideration, and I adjudged the 2001 plan to be entitled to deference. *See Albert v. 2001 Legislative Reapportionment Comm'n,* 567 Pa. 670, 688, 790 A.2d 989, 1000 (2002) (Saylor, J., concurring). Ultimately, then, on the merits, and respecting the substantial deference which is to be accorded to such a plan, I believe the 2011 Legislative Reapportionment Plan is also constitutionally permissible. It therefore follows that I remain unable to join the mandate of the Court.

JUSTICE EAKIN, concurring and dissenting.

I join much of the majority opinion. However, I do not find the Legislative Reapportionment Commission (LRC) plan to be contrary to the Constitution, and I join in full the expressions of Justice Saylor in that regard.

The process of redistricting is complex beyond words. The need to consider all the factors necessary—contiguousness, compactness, equality of population, respecting political subdivisions down to the ward level, avoiding disenfranchising racial and ethnic groups, the federal Voting Rights Act—makes this a daunting task for the LRC. The result of changing any one area of its plan was aptly likened by counsel to squeezing a water balloon: if you squeeze it here, it will bulge over there. If you change one line, it causes ripples that necessitate changes elsewhere.

An inherent problem in reviewing challenges to the ultimate plan is that no mechanism exists for the LRC to justify or

explain its considerations or decisions. For better or worse, there are no means for it to explain individual lines or boundaries. It is never "absolutely necessary" to draw a line in any spot—it could always go elsewhere, but there is no process articulating what considerations were behind the decision to put it where the LRC did.

Since there is no record, we cannot tell why the LRC did what it did. This is a problem for both those who would challenge the plan and for those of us who must evaluate those challenges. For example, the "Holt plan" was not adopted by the LRC, but we do not know what consideration it received. We can surmise reasons it was not enacted, but this is mere conjecture.

It is entirely possible that this plan, lovely on its surface, is not so beautiful when examined in depth—on the other hand, it may be a masterpiece. We do not know and are not possessed of the means to make such an evaluation, particularly given the time constraints cogently detailed in the majority's opinion.

The bottom line is that we do not know whether the Holt plan, or any other plan, proves anything other than that it is possible to divide fewer political subdivisions. This in my judgment does not prove the LRC plan is unconstitutional. The bipartisan LRC, however, has the time, the means, and indeed the mandate to consider all options, and I would give it significant deference. Given that deference, the burden on challengers is indeed heavy and, in my judgment, has not been met in this case.

The 2011 plan has fewer problems than the plan we found constitutional in *Albert;* it is not unconstitutional under existing precedent. While I do not quarrel with the majority's reordering of constitutional priorities, I do not find a need to make that reordering retroactive.

Redistricting is required to ensure constitutional representation of all voters, reflecting population changes that occur over a decade. Computers or not, drawing a new plan using

new rules will not happen in time for this year's elections. Changing the rules and rejecting the otherwise constitutional plan subjects our citizens to continued unbalanced representation. I find this result unnecessary.

As such, I cannot join the order rejecting the 2011 Legislative Reapportionment Plan.

Justice ORIE MELVIN, dissenting.

The Majority Opinion expeditiously provides significant breadth in scope and history of legislative redistricting, but I remain convinced that the Final Plan should be affirmed. The complaints of the various appellants notwithstanding, it is clear that there is no perfect plan. The Majority "recalibrates" the interplay of the constitutional requirements found in Section 16 of the Pennsylvania Constitution. In so doing, it invalidates the 2011 Final Plan, which was carefully constructed by the Legislative Reapportionment Commission (LRC) in accordance with our prior pronouncements concerning redistricting in the Commonwealth. In light of the significant public interest and exigencies of the electoral process, I believe that the Majority's disposition is both unprecedented and unnecessary. Accordingly, I must dissent.

While our reapportionment precedent is limited, it unequivocally demonstrates that our overarching concern in redistricting matters is substantial equality of population. *See Specter v. Levin,* 448 Pa. 1, 293 A.2d 15, 19 (Pa.1972) ("Section 16's desire for districts that are 'compact' must also yield, if need be, 'to the overriding objective . . . (of) substantial equality of population.' ") (quoting *Reynolds v. Sims,* 377 U.S. 533, 579, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964)); *In re Reapportionment Plan for the Pa. General Assembly (In re 1981 Reapportionment),* 497 Pa.525, 442 A.2d 661, 665 (Pa.1981) (articulating same principle); *In re 1991 Pa. Legislative Reapportionment Comm'n,* 530 Pa. 335, 609 A.2d 132, 138 (Pa.1992) (same); *Albert v. 2001 Legislative Reapportionment Comm'n,* 567 Pa.

670, 790 A.2d 989, 993–94 (Pa.2002) (same). Indeed, the Majority recognizes this to be true. *See* Majority Opinion, at 437, 37 A.3d at 756 ("[T]his Court's prior decisions emphasized equality of population as **the primary directive** in the redistricting efforts of the LRC." (emphasis added)).[1] This acknowledgement, irrespective of any qualifying language, highlights the fallacy that the current plan is contrary to law. In view of this Court's precedent, I find that the LRC acted in good faith in adopting the 2011 Final Plan. Consistent with our prior pronouncements, the LRC promulgated a plan that ultimately achieved substantial equality of population while balancing the other mandates in Section 16.

As justification for the conclusion that the 2011 Final Plan is unconstitutional, the Majority cites an alleged excessive number of subdivision splits, admonishing that prior plans cannot serve as a benchmark for scrutinizing subsequent plans. Despite this contention, we have undertaken a comparative approach in the recent past. Specifically, in *Albert* we compared the 2001 Final Plan with those previously approved by this Court. Finding that the number of subdivision splits was similar, we determined the 2001 Plan withstood constitutional scrutiny. *Albert*, 790 A.2d at 998 ("[The Commission] claims that ... no political subdivision was divided in forming a district unless absolutely necessary. Upon comparison of the instant Final Plan with those previously approved by this Court, we agree."); *id.* at 999 n. 12.[2] The Majority has not

1. While the Majority opines that our previous emphasis on population equality derived from federal law, *see* Majority Opinion, at 443, 37 A.3d at 759 ("Rather than deriving from our Constitution itself, the primacy of population equality in redistricting, which is clearly established in our decisional law, derives from federal decisional law...."), our case law states otherwise. *See In re 1981 Reapportionment*, 442 A.2d at 665 ("In *Specter*, this Court also made clear that, as a matter of **both** federal and state law, equality of population must be the controlling consideration in the apportionment of legislative seats." (emphasis added)).

2. In making this point, I do not advocate adopting a maximum or minimum variation or setting a ceiling on permissible subdivision splits. I simply wish to reiterate that prior plans are instructive when considering whether a current plan comports with constitutional requirements.

convinced me that the LRC's use of the same exercise herein produced a constitutionally deficient plan.

I find it unnecessary to criticize the timeliness of the LRC's actions, *see* Majority Opinion, at 380–383, 37 A.3d at 721–23, and I disagree that it unnecessarily delayed this Court's disposition. The LRC's actions comported to the time frame set forth in Article 2, Section 17(c) of our Constitution, and both the LRC and this Court have proceeded with due diligence in this matter.

The LRC faithfully applied our existing precedent in preparing the 2011 Final Plan. By failing to uphold the LRC's reliance on our prior decisions, the Majority interjects uncertainty into future redistricting cases. *See* Majority Opinion, at 440–442, 37 A.3d at 757–58. Moreover, by declaring that the 2001 Plan remains in effect, the Majority ensures that certain districts will be overrepresented while others will be underrepresented, as evidenced by population shifts from 2000 to 2010. Such a situation is untenable. Finally, it is a fiction for the Majority to represent that the initial opportunity to "go forward" is upon remand. Majority Opinion, at 376, 37 A.3d at 718. Rather, in my view, it is a step back. The LRC produced a reasoned plan that comports both with our decisional law and our Constitution. I am amenable to guidelines but only if they are truly prospective, i.e., applicable to the next decennial redistricting.

Having reviewed the Final Plan as a whole, and in view of existing precedent, I conclude that it is constitutionally permissible. Therefore, I would approve the Final Plan, thus allowing it to have "the force of law." Pa. Const. art. 2, § 17(e).